**In re Antonio CASALE, a/k/a J. Anthony Casale, Debtor.**

**Dorothy EISENBERG, Trustee, Estate of Antonio Casale, Debtor, Plaintiff,**

**v.**

**Antonio CASALE, a/k/a Anthony Casale, a/k/a J. Anthony Casale, Bonaventure Construction Corp., John Casale and Carl P. Maltese, Defendants.**

Bankruptcy No. 881–80660.
Adv. 084–0075.

United States Bankruptcy Court,
E.D. New York.

July 8, 1986.

Shaw, Goldman, Licitra, Levine & Weinberg, Garden City, N.Y., for plaintiff-trustee; by Karen Carter Caso, and Sarah Keenan.

Macco, Hackeling & O'Shea, Melville, N.Y., for defendant-debtor; by Michael Macco.

Emanuel G. Sfaelos, Centerport, N.Y., for defendant Carl P. Maltese.

Carl P. Maltese, Smithtown, N.Y., for defendant Bonaventure Const. Corp. and defendant John Casale.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

This is an adversary proceeding brought by the Trustee of the Estate of Antonio Casale against Casale, Bonaventure Construction Corp. ("Bonaventure"), John Casale, (the debtor's father), and Carl P. Maltese, Esq., to compel the turnover, pursuant to Section 542 of the Bankruptcy Code, of certain real property or the value thereof.

The complaint alleges that Bonaventure was the record owner until October 20, 1980 of a one-family house at 1 Wagon Wheel Lane, Dix Hills, New York, ("Wagon Wheel"); that the debtor was the President of Bonaventure; that Bonaventure was a mere conduit for his personal and business activities; that Bonaventure was the nominee of the debtor and the property was actually property of the debtor's estate; that Wagon Wheel was transferred in October, 1980, to Carl P. Maltese, Esq., the debtor's and Bonaventure's attorney, in order to hinder, delay and defraud the debtor's creditors; that at the time of the transfer, Wagon Wheel had a value of $275,-000.00; that Maltese paid no consideration for Wagon Wheel and had reasonable cause to believe that the transfer was fraudulent. The relief requested is that the Court declare Wagon Wheel to be property of the debtor's estate; that the transfer be avoided and that Maltese be directed to turn over the property to the estate or the sum of $275,000.00, plus interest.

The defendants filed general denials and a counterclaim. The counterclaim has not been tried; a motion has been made to dismiss it. With the consent of the parties, no action was taken on the motion to dismiss pending resolution of the issues raised by the complaint. It is now being dismissed and is the subject of a separate Opinion and Order.

The issues raised by the complaint were tried on December 10, 1985, January 21, 1986 and January 24, 1986. At the conclusion of the presentation of the plaintiff's case, a motion was made to dismiss, which was renewed at the conclusion of the trial. The Court reserved decision on these motions which are now being decided.

This is a core proceeding. 28 U.S.C. § 157(b)(2)(E). When it was initiated on September 28, 1984 this Court was operat-

ing under the Emergency Bankruptcy Rule, and, in particular, the order of reference issued by Chief District Judge Weinstein of the Eastern District of New York on July 12, 1984. That Rule is constitutional. *In re Kaiser,* 722 F.2d 1574 (2d Cir. 1983).

## FINDINGS OF FACT

1.· In September, 1980, two judgments totalling $45,000.00 were obtained against the defendant, Antonio Casale. (Tr. 1/24/86, p. 9). These judgments are still unpaid. (Tr. 1/24/86, p. 11–12).

2. In April, 1980, John Casale and his wife, Mary Casale, had an estimated net worth of over one million. (Trustee Exhibit # 17). Among their assets was 100 percent ownership of two corporations, Bonaventure and Nautilus Construction Corp. ("Nautilus"). (*Ibid.*; Trustee's Exhibits # 2, 4, 5, 17; Tr. 12/10/85, p. 34).

3. At all times relevant to this proceeding, Casale was President of Bonaventure. (Trustee's Exhibits # 1, 2 and 11).

4. In October, 1980, Bonaventure's principal asset was a house which it had constructed at 1 Wagon Wheel Lane, Dix Hills, New York. (Trustee's Exhibit # 17). This property in September, 1980, had a value of "hundreds of thousands of dollars". (Tr. 1/21/86, p. 28). (See also, Trustee's Exhibits # 5, 17, 21).

5. Following the entry of the judgments against him, Casale, as President of Bonaventure, executed a deed on October 20, 1980, transferring title of the Wagon Wheel house to the defendant, Carl P. Maltese, Esq. (Trustee's Exhibit # 1).

6. Maltese is an attorney who had organized Bonaventure and served as one of its officers. (Tr. 1/24/86, p. 57–58, 85). He also acted at various times as the attorney for the debtor, for Bonaventure and for the debtor's father. (*Ibid.*)

7. According to an unsigned contract of sale, bearing the date August 1, 1980, Maltese was to pay Bonaventure the sum of $100,000.00 as consideration for the deed. (Trustee's Exhibits # 1, 23, 24; Tr. 1/24/86, p. 77–80).

8. There is no evidence that the contract of sale bearing the date of August 1, 1980 was prepared on that date.

9. Maltese did not, in fact, pay Bonaventure the consideration recited in the unexecuted contract of sale and it appears likely that he paid nothing for the deed. At the trial, he claimed that he turned over as consideration $38,000.00 obtained from a mortgage given by the Greenpoint Savings Bank, a $10,000.00 down payment, $25,000.00 in cash borrowed from the Nassau County Trust Company, the surrender to the debtor's father of property owned by him, Maltese, in Hollywood, Florida, plus forgiveness of various legal bills owed by the debtor's father. (Tr. 1/24/86, p. 63–64, 70–74, 136–139). However, Maltese conceded that the Florida property was never turned over to the debtor's father. (*Id.,* at 88, 136–137). He, likewise, conceded that the loan from Nassau Trust Company was made many months subsequent to the transfer of the Wagon Wheel property. *Id.* at 71–72. In fact, it was not until March, 1981, that the Nassau Trust Company lent $25,000.00 to Maltese. (Tr. 1/21/86, p. 15). Nor was Maltese able to produce at the trial any bills to the debtor's father for legal services. (Tr. 1/24/86, p. 73–74). He likewise produced no evidence that $10,000.00 was given Bonaventure as a down payment. *Id.,* p. 64, 73).

10. Simultaneous with the transfer of legal title from Bonaventure to Maltese, the Greenpoint Savings Bank lent Maltese $38,000.00 secured by a mortgage on Wagon Wheel. (Trustee's Exhibit # 24).

11. Up to seven or eight months ago, the mortgage on Wagon Wheel was paid by Casale out of the bank accounts of Bonaventure or Nautilus. (Trustee's Exhibit # 21; Tr. 1/21/86, p. 84).

12. Maltese does not know who was paying the mortgage, but he "hope[s] somebody is paying it, Bonaventure is supposed to be paying it". (Tr. 1/24/86, p. 76).

892

13. Since Wagon Wheel was completed, Casale has resided there with his family, paying no rent to anyone. (Tr. 1/24/86, p. 85). He puts the date of the entry into occupancy as Thanksgiving, 1980. (Tr. 1/21/86, p. 68). He claims that his occupancy is "part of [my] income from the corporation". (Tr. 1/21/86, p. 85). That it is "part of [his] salary, [his] fringe benefit because [his] salary is low". (*Id.*). He claims to declare the benefit as income on his tax return. (*Id.* at 86).

14. Maltese has never resided at the Wagon Wheel property. (Tr. 1/21/86, p. 83). He has never collected any rent from anyone for its occupancy and has given no lease to Casale. (Tr. 1/24/86, p. 76).

15. On February 26, 1981, Casale filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. According to his petition, his name is Antonio Casale and he has also been known as J. Anthony Casale.

16. In fact, both before and after the filing of the petition, the debtor has used a variety of other names, including "John Casale", "John Casale, Sr.", "J. Anthony Casale, Sr.", "Tony Casale". (Tr. 1/24/86, p. 3, 17-21; Trustee's Exhibits # 1, 13, 18, 19).

17. The debtor's father's name is John Casale, his mother's name is "Mary" and his wife's name is "Marie Jane", but she is also called "Mary". (Tr. 1/21/86, p. 59). The similarity of names between himself and his father and between his mother and his wife is employed by Casale in order to claim that documents he signs and representations he has made respecting himself and his wife were really signed by, or on behalf of, his father, or were really made respecting his father or his father and his father's wife and that he signed his father's name pursuant to a power of attorney. (Tr. 1/21/86, p. 31-31, 58-59, 67, 71-71).

18. This Court finds that wherever the debtor employed the name "John Casale", "John Casale, Sr." or "J. Anthony Casale, Sr.", the person intended and referred to was himself and not his father. And that,

likewise, all statements submitted on behalf of "John and Mary Casale" were submitted by the debtor on behalf of himself and his wife and not on behalf of his father and his mother. This Court further finds that when the defendant signed as "John Casale", he was not acting pursuant to a power of attorney for his father.

19. Casale did business with a number of banks. In 1979 and 1980 he made banking arrangements with Nassau Trust on behalf of Nautilus and Bonaventure. (Trustee's Exhibits # 16, 18, 19). He identified himself to the bank's officers as "J. Anthony Casale", who believed his name to be John Anthony Casale. (Tr. 1/21/86, p. 4-5, 10, 12, 15).

20. In 1979, he signed the signature card for Nautilus as "J. Anthony Casale, Sr.", (Trustee's Exhibit # 18; Tr. 1/21/86, p. 11), and the signature card for Bonaventure as "J. Anthony Casale". The card gives as the address of the corporation, 1 Wagon Wheel Lane. (Trustee's Exhibit # 19; Tr. 1/21/86, p. 12).

21. On September 15, 1980, the Nassau Trust Company requested the debtor to guarantee a loan which the bank was extending to Nautilus. (Tr. 1/21/86, p. 5). In that connection, the bank requested a personal financial statement from the debtor. In response, the debtor submitted a financial statement for himself and his wife, captioned "John and Mary Casale", showing them to own 100 percent of the stock of Bonaventure. (Trustee's Exhibit # 17; Tr. 1/21/86, p. 7-9).

22. The same day, he signed a personal guaranty of the advances to Nautilus. He signed as "J. Anthony Casale" and his signature was notarized by the bank's assistant branch manager. (Trustee's Exhibit 16; Tr. 1/21/86, p. 5-7).

23. In November, 1981, after Casale had filed for bankruptcy in February, 1981, under the names of Antonio Casale and J. Anthony Casale, he borrowed money from Extebank on behalf of Bonaventure, using the name "John Casale, Sr.", (Trustee's Exhibits # 9, 3) and "John Casale". (Trust-

ee's Exhibit #2; Tr. 12/10/85, p. 45–46, 101–102).

24. In connection with this loan, he and his wife signed a number of documents in the presence of Patrick Pizza, an officer of Extebank, as John and Mary Casale. (Tr. 12/10/85, p. 46–81). One of these documents was notarized by Pizza. (Trustee's Exhibit #4). Pizza knew the debtor only as John Casale or John Anthony Casale. (Tr. 12/10/85, p. 45, 62). Extebank was furnished by Casale with the following documents, all submitted in the name of "John Casale, Sr." or "John Casale":

(a) a corporate resolution authorizing John Casale, as President of Bonaventure, to borrow money from Extebank and signed by "John Casale, President" (Trustee's Exhibit #2).

(b) a guaranty of the payment of any loans to Bonaventure executed by "John Casale, Sr." and "Mary Casale" (Trustee's Exhibit #3). This was delivered already signed and notarized to Pizza. (Tr. 12/10/85, p. 54–55);

(c) a statement of the net worth as of January 31, 1981 of "John and Mary Casale", which included among the assets shown the net worth of Nautilus and the net worth of Bonaventure, handed to Pizza personally by the debtor. (Trustee's Exhibit #5; Tr. 12/10/85, p. 73–74). This statement showed John and Mary Casale to be the owners of the residence at 1 Wagon Wheel Lane and showed the residence to have a value of $275,000.00 as of January 31, 1981. (*Id.*);

(d) a general security agreement giving Extebank a security interest in all Bonaventure's personal property signed by Casale as "John Casale, Sr." in the presence of Pizza. (Trustee's Exhibit #9; Tr. 12/10/85, p. 83);

(e) a guaranty of payment by Nautilus of the moneys advanced to Bonaventure executed in Pizza's presence by both John Casale and Mary Casale, as the owners and holder of all the outstanding shares of stock of Nautilus and notarized by Pizza.

(Trustee's Exhibit #4; Tr. 12/10/85, p. 63–67); and

(f) financial statements for Bonaventure and Nautilus delivered personally to the Bank by the debtor. (Trustee's Exhibits #6, 7; Tr. 12/10/85, p. 75–78).

25. During 1981, the debtor drew checks on the account maintained by Bonaventure in Extebank to pay for personal family obligations and gifts. He signed all these checks "John Casale". (Trustee's Exhibit #14). The signature was the one with which the Extebank official was familiar as the debtor's signature. (Tr. 12/10/85, p. 94).

26. In addition to corporate accounts, Casale opened a personal joint checking account with his wife, Mary. (Title of account "John and Mary Casale") (Trustee's Exhibit #13; Tr. 12/10/85, p. 92–93). The debtor signed the signature card for the joint account with his wife and in his individual capacity, not as an officer of Bonaventure, and listed his name as "John". (*Id.*).

27. In April, 1982, still employing the name "John Casale, Sr.", the debtor negotiated a loan for $47,500.00 from Extebank to Bonaventure secured by a mortgage on certain property located in Lattington, Town of Oyster Bay. (Trustee's Exhibits #11, 12; Tr. 12/10/85, p. 88–91). The debtor signed the name "John Casale" to the bond and mortgage in the presence of the bank's officers who had negotiated these loans. (*Id.*). The name of "John Casale, Sr., President" was typed under the signature line. The documents were notarized by Pizza. (*Id.*).

28. In May, 1982, the debtor executed a promissory note to Extebank in the amount of $47,500.00 on behalf of Bonaventure, again signing the name "John Casale". (Trustee's Exhibit #10; Tr. 12/10/85, p. 85–86).

29. By employing the name "John Casale," or "John Casale, Sr.", the debtor was able to obtain credit under that name even while seeking relief under the bankruptcy laws under the name "Antonio Casale".

30. Antonio Casale was, at all times, and is the beneficial owner of the property located at 1 Wagon Wheel Lane.

31. Bonaventure held title to the property at 1 Wagon Wheel Lane, for the benefit of Casale.

32. The transfer of the property at 1 Wagon Wheel Lane, from Bonaventure to Maltese, was made with the intent to hinder, delay or defraud Casale's creditors.

33. Casale used Bonaventure as the corporate vehicle by which to accomplish this fraud.

34. Casale exercised complete dominion and control over Bonaventure.

35. Bonaventure was a mere shell that Casale used to carry on his own personal business and for his own personal benefit.

36. Failure to disregard the corporate form of Bonaventure would result in a fraud on Casale's creditors.

## DISCUSSION

What the trustee seeks in this case is a declaration that the property known as 1 Wagon Wheel Lane, Dix Hills, New York, is property of the debtor's estate. The trustee asks the Court to reach this result by piercing the corporate veil and deeming Bonaventure and the debtor to be one and the same, making the pre-petition transfer of the property to Maltese vulnerable as a fraudulent conveyance.

To this Court, there appears to be a more direct path to this same result: finding Wagon Wheel to be part of the debtor's estate. In the personal net worth statement submitted to Extebank on November, 1981, the debtor represented himself and his wife to be the owners of the Wagon Wheel property as of January 31, 1981. Who actually signed this document is immaterial. It was submitted to the Bank as the financial statement of the debtor and his wife. This financial statement was a continuing representation that the debtor and his wife, during the period, January 31, 1981 to November, 1981, spanning the filing of this petition in this Court, were the owners of Wagon Wheel.

The debtor's claim of ownership corresponds with all the known facts. The debtor and his family have occupied the property since the building was completed. They have never paid rent to anyone for the privilege. And even as the debtor was claiming bankruptcy, he has been paying the mortgage on Wagon Wheel out of the Bonaventure and Nautilus accounts.

No one has a better claim to ownership than the debtor. Bonaventure divested itself of the property as of October 20, 1980. Maltese can make no claim to be the owner, despite the recorded deed in his name. It is doubtful if he paid anything for the property. He collects no rent on it. He not only is not paying the mortgage, which burdens the property, but cannot even identify who is doing so. He "hope[s] somebody is paying it, Bonaventure is supposed to be paying it" (Tr. 1/24/86 at 76), despite the fact that Bonaventure is supposed to have parted with title many years ago. Maltese's deed is, at best, a cloud on the title, which should be avoided as a sham and a fraud. The deed was a transparent device intended to shield the assets of his client, Casale, from the judgments obtained one month earlier.

The Court has carefully considered the defendant's claim that Casale was not the owner and president of Bonaventure and the beneficial owner of 1 Wagon Wheel Lane, but that his father owned everything and permitted the debtor to work for Bonaventure, to occupy the home he did out of generosity, and that when the defendant signed as "John Casale", he was acting pursuant to a power of attorney given him by his father. (¶ 18, *supra*). This was the version of the facts supplied by Casale, himself, by Maltese and by Bonaventure's accountant, John C. Paolillo. (Tr. 1/21/86, p. 48–49, 67–71; Tr. 1/24/86, p. 74, 84, 87, 92; Trustee's Exhibit # 25, p. 5–6, 16).

However, this Court has concluded, reluctantly, since an attorney-at-law is one of the witnesses so testifying, that like much else claimed by the defendants, the explanation given of the defendant's use of the

name "John Casale" and of his occupancy rent free of 1 Wagon Wheel Lane has no basis in fact.

Opposed to it is not only the testimony of Pafundi (Tr. 12/10/85, p. 32–34) and Eisenberg (Tr. 1/24/86, p. 10), one of whom was engaged in business with Casale, who heard him claim ownership of Bonaventure, but also the evidence of two disinterested bank officials, supported by contemporaneous documentary evidence. Both officials dealt with him as the principal of both Nautilus and Bonaventure, knew him as John Casale or John Anthony Casale, and one, as notary, even acknowledged Casale's identification of himself as "John Casale". No power of attorney comprehends appearing before a notary and claiming to be that person. Further documentary evidence rebutting the claim that the debtor used the name "John Casale" only when acting as attorney for his father, is the fact that the debtor's personal account in Extebank was maintained in the name of John Casale and Mary Casale and the checks drawn on it were all signed "John Casale". (¶ 26, *supra*).

But even more fundamental is the fact that both Casale and Maltese have forfeited any claim to credibility. Too much of what they testified to will not bear close examination. Insisting, as they must, that the transfer of title to the Wagon Wheel property to Maltese in October, 1980 was a bonafide transfer for a good consideration, they cannot come up with a satisfactory explanation for the fact that notwithstanding the transfer, Casale continued to reside in the premises rent-free and Bonaventure continued to pay the mortgage. (¶'s 11 & 13, *supra*).

▆ The claim that occupancy was a fringe benefit to Casale because his salary from his employer was low and that he even declared it as such on his income tax, will not square with the fact that there is no evidence that Maltese was ever Casale's employer rather than his employee. Indeed, Casale claims that he did not even move into the property until after Thanksgiving, 1980 (Tr. 1/21/86, p. 83)—a claim

which this Court thinks most dubious—and, therefore, never even occupied it while title was still in Bonaventure. Its occupancy, therefore, could never have been a fringe benefit from his employment.

Equally at odds with the claimed bonafides of the transfer to Maltese is the fact that until seven or eight months ago Casale paid the mortgage on the property through the bank accounts of Bonaventure or Nautilus, whichever had funds at the end of the month. (¶ 11, *supra*). If the property was really the property of Maltese, why were Nautilus and Bonaventure using their funds to build up Maltese's equity? Why was Maltese so indifferent to the encumbrance on the property he ostensibly owned as not even to know who was paying the mortgage.

Further reflecting on the credibility of Maltese is his explanation of what composed the consideration for the transfer to him of the deed to Wagon Wheel in October, 1980. Part of the consideration, he maintained, consisted of legal services rendered Casale, Sr., but he could produce no bills to back up the claim. (¶ 9, *supra*). Part, he maintained, was the product of a loan made by Nassau Trust Company, but the loan was made in March, 1981, many months after the alleged transfer. (*Id.*). Another portion, he said, consisted of the mortgage from Greenpoint. But, as pointed out, he has never paid the mortgage. Part, he claimed, was the value of a condominium in Florida, which, however, was never transferred because the elder Mrs. Casale suffered from vertigo and decided against living there. (Tr. 1/24/86, p. 88). But people who have come into possession of valuable real estate they cannot use for their own reasons, normally sell it. They do not just walk away from it. How much less likely is it that a man who, like the debtor's father, has been in the business of buying and selling real estate would simply give up a valuable property because his wife did not want to live in it. When Maltese was asked to explain how, in 1983, when first interrogated about the consideration, he had totally failed to mention the

Florida condominium as part of the October, 1980 deal, the best he was able to come up with by way of explanation was "I didn't want to". (Tr. 1/24/86, p. 28).

Nothing shows up the inconsistencies of the defendants' version of events more, however, than the January, 1980 net worth statement for John and Mary Casale, submitted to Extebank in November, 1981, which the defendants claim was submitted on behalf of the debtor's father and mother and shows John and Mary Casale to be the owners of Wagon Wheel. (¶ 19, *supra*). There is no way that this claim can be reconciled with the defendants' claim that Bonaventure had been the property of the debtor's father, and that Bonaventure had transferred the Wagon Wheel property for good consideration to Maltese in October, 1980. If Bonaventure had transferred the property in 1980, how could the debtor's father claim in 1981 to still own it, even if he were the owner of Bonaventure?

The answer is that Casale's father and mother were never the owners of either Bonaventure or Wagon Wheel, that the Wagon Wheel property never really changed hands, that the debtor's corporate creature, Bonaventure, transferred naked legal title to Maltese to permit Casale to continue enjoying the benefits of ownership without interference by his creditors. That is the only explanation of the fact that Casale has occupied this house rent free since it was built, that he meets the mortgage payments as they fall due out of the bank accounts of Bonaventure and Nautilus and that Maltese has been unable to demonstrate that he gave any consideration for the transfer of title to him in October, 1980.

■ Since the debtor was the beneficial owner of the Wagon Wheel property when he filed for relief under Title 11, that interest in the Wagon Wheel property, like his other property, passed to the trustee in bankruptcy and now constitutes part of the estate to be liquidated by her. A debtor's estate is comprised of "all legal and *equitable* interests of the debtor in property as of the commencement of the case". 11

U.S.C. § 541(a)(1) (emphasis supplied). The trustee, therefore, is entitled to an order directing the turnover of property to her and to an order cancelling, as a sham and a fraud, the deed held by Maltese. In short, the trustee is entitled to the relief she requests—the turnover of the Wagon Wheel residence to her, without resort to the need for piercing the corporate veil, because on the date the debtor filed, Bonaventure had no interest in the Wagon Wheel property.

■ The same result can be reached by the route urged by the trustee, that is by piercing the corporate veil, disregarding the separate corporate existence of Bonaventure, deeming its assets to be those of the debtor, and, therefore, the transfer to Maltese on October 20, 1980 of legal title to Wagon Wheel to be in fraud of the debtor's creditors.

Square authority for piercing the corporate veil on facts like those present here is *Irving Trust Co. v. Kaminsky*, 22 F.Supp. 362 (S.D.N.Y.1937). In that case, the trustee in bankruptcy of one Kaminsky brought suit against the debtor's son, among others, charging a fraudulent conveyance under § 70(e) (the statutory predecessor of the Code provisions here involved). The gist of the charge, as set forth by District Judge Patterson in his opinion, was:

"... that prior to bankruptcy and at a time when he was insolvent Kaminsky determined to get rid of his assets and formed a plan to hinder, delay, and defraud his creditors; that among his assets was the entire capital stock of a company; that some nine months before bankruptcy he caused the company to transfer all its assets to his son Harry, one of the defendants, without consideration; that Harry then transferred the assets to new companies in exchange for their capital stock; that Kaminsky's stock was thus rendered worthless while his son got the entire assets of the company; that the transfers of the corporate property were made in execution of the plan to cheat his creditors. There are further allegations to the effect that Ka-

minsky had complete control and dominion over the company, and used and controlled its assets as thoroughly as if his own, the company being merely used for his convenience in handling the property." 22 F.Supp. at 362–363.

The District Court rejected a motion to dismiss the complaint predicated on the argument that the debtor had not been shown to have transferred any property, that the only property transferred was that of the debtor's company, saying:

"But this is putting too literal a construction on the section and too technical a view on the transactions alleged to have taken place ...

... Kaminsky did not part with his shares of stock. But by causing his companies to transfer their entire assets to his favored kinsmen, he arrived at the same destination in a roundabout way, and the fraud which the transfers worked on his creditors was as real as if he had taken the direct route. In order to circumvent such a fraud, the fiction of the corporate entity will be ignored and the transfers treated as what in effect they were, transfers by the bankrupt of his own property. A person may not make use of a separate corporate existence to evade his liabilities." 22 F.Supp. at 363.

New York and Federal law are in agreement that "Courts will pierce the corporate veil when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime." *In re Gibraltor Amusements, Ltd.,* 291 F.2d 22, 24 (2d Cir.1961). "Although a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy." *Bangor Punta Operations, Inc. v. Aroostook Railroad Co.,* 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974); *Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980); *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53, 54 (2d Cir.1984); *International Aircraft Trading Co. v. Man-ufacturers Trust Co.,* 297 N.Y. 285, 292, 79 N.E.2d 249 (1948); *Port Chester Elec. Const. Co. v. Atlas,* 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976); *Quad v. Ratkowsky,* 183 A.D. 428, 432, 170 N.Y.S. 812 (1918), *aff'd,* 224 N.Y. 624, 121 N.E. 887 (1918); *Walkovszky v. Carlton,* 18 N.Y.2d 414, 417, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966).

However, while the basic doctrine is well settled, the law in this area, as the Court of Appeals noted in *Brunswick Corp. v. Waxman,* 599 F.2d 34, 35 (2d Cir.1979), referring to the New York authorities, but with equal justice could have been speaking of Federal law, "is hardly as clear as a mountain lake in springtime". The Court continued:

"We are rather inclined to agree with Professor Cary that '[n]o concept of separate corporate personality will suffice to solve an actual problem.' *Cary, supra,* at 110. 'What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result.' *Latty, Subsidiaries and Affiliated Corporations* 191 (1936)." 599 F.2d at 36.

Conceptualism, the Court said, is to be eschewed in an area where isolated rules in a variety of cases require a factual analysis of each. *Ibid.* Liability is imposed "to reach an equitable result". *Id.,* at 36.

A conventional formulation is that "the courts will disregard the corporate form, or, to use accepted terminology 'pierce the corporate veil', whenever necessary 'to prevent fraud or to achieve equity' ". *Walkovszky v. Carlton,* 18 N.Y.2d 414, 417, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966).

Among the relevant factors which have led the courts to disregard the separate existence of a corporation, is the use of a corporation for transaction of a shareholder's personal business or its use merely as a facade for the stockholder's own operations. *African Metals Corp. v. Bullowa,* 288 N.Y. 78, 85, 41 N.E.2d 466 (1942). *See also, Natelson v. A.B.L. Holding Co.,* 260 N.Y. 233, 183 N.E. 373 (1932); *Halsted v.*

*Globe Indemnity Co.,* 258 N.Y. 176, 179, 179 N.E. 376 (1932). Another factor is complete dominion and control over the corporation by one individual. *Majestic Factors Corp. v. LaTino,* 15 Misc.2d 329, 184 N.Y.S.2d 658 (1959), *appeal dismissed,* 8 A.D.2d 594, 187 N.Y.S.2d 1017 (1st Dept. 1959). *See also, Lowendahl v. Baltimore & Ohio Railroad Co.,* 247 A.D. 144, 287 N.Y.S. 62 (1st Dept.1936), *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (1936), *rearg. den.,* 273 N.Y. 584, 7 N.E.2d 704 (1937); *Guptill Holding Corp. v. State,* 33 A.D.2d 362, 307 N.Y.S.2d 970 (3d Dept.1970), *aff'd.,* 31 N.Y.2d 897, 340 N.Y.S.2d 638, 292 N.E.2d 782 (1972).

Casale at all times has had total control over the corporation of which he is sole owner. He is Bonaventure's President and its sole operating officer; he has treated the corporation's funds as his own, drawing on them for Christmas gifts for his children and using them, until recently, to pay off a mortgage on the house he occupies in which Bonaventure has had no interest since October, 1980.

It is equally clear that Bonaventure has been used as a vehicle by Casale for entirely personal ends. Up to October 20th, 1980, Bonaventure's sole function appears to have been to build and hold legal title to the house the debtor was using as his personal residence. Although the house had allegedly been built for sale, it was not sold in the ordinary and normal course of business to a third party for the purpose of realizing a profit, but was turned over to an insider, Maltese, at less than its full value, obviously so that the debtor could continue living in it.

From the time Bonaventure was first organized, therefore, until the conveyance with which we are here concerned, it functioned solely to serve the personal needs of the debtor, originally to provide him with a home, and then for the same purpose, giving up its investment in this property in order to permit Casale to continue living there insulated from the claims of creditors.

If both the debtor and Maltese had not been concerned that Bonaventure might be regarded as having no separate legal existence from Casale, they would not have taken the step of transferring title in the Wagon Wheel property from Bonaventure to Maltese after a substantial judgment was entered against Casale. In short, they apprehended exactly what the trustee is here claiming, that the corporate veil between Bonaventure and the debtor was so flimsy that it was likely to be pierced. The evaluation of the situation by those in the best position to know, Maltese and the debtor, carries much weight.

Exactly as was true in *Irving Trust Co. v. Kaminsky, supra,* the debtor used his control over the corporation to work a fraud on his creditors, thereby justifying the Court in ignoring the fiction of the corporate entity in order to circumvent the ·fraud.

The transfer by Bonaventure in October, 1980, of the Wagon Wheel property to Maltese was made in order to hinder, delay and defraud the creditors of Casale. It was made to preserve the benefits of ownership to the debtor while insulating such ownership from his creditors. It was accompanied by nearly all the traditional "badges of fraud" which establish actual intent to defraud. They include: "(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; ... and (6) the general chronology of the events and transaction under inquiry". *In re May,* 12 B.R. 618, 627 (Bankr.N.D.Fla.1980), quoted and relied on in *In re Kaiser,* 722 F.2d 1574, 1582–1583 (2d Cir.1983).

The Court finds that the transfer was made with actual intent to defraud. Consequently, it was a fraudulent conveyance under the laws of the State of New York and under the Bankruptcy Code, vulnerable to avoidance by the trustee. N.Y. Debt. &

Cred. Law § 276, 278 (McKinney 1945); 11 U.S.C. § 544, § 548(a)(1). The trustee, having elected to avoid the transfer, the property must be turned over to her as her complaint requests. The deed held by Maltese must be voided, 11 U.S.C. § 550, since he has established none of the grounds that entitle the transferree of a fraudulent conveyance to retain possession and the record establishes the contrary.

## CONCLUSIONS OF LAW

The transfer of title to the Wagon Wheel property to Maltese was a sham, designed to conceal the retention of beneficial ownership in the property by Casale.

Because of the debtor's domination of Bonaventure, his use of it for purely personal business and to perpetrate a fraud upon his creditors, its separate corporate identity should be disregarded and its transfer of title to Wagon Wheel to Maltese be deemed a transfer in fraud of Casale's creditors.

In view of the Maltese's close connections with Bonaventure and Casale, he was not a good faith transferree and took legal title to Wagon Wheel with knowledge of the voidability of the transfer. He, therefore, is obliged to surrender to the trustee the legal title he now holds to Wagon Wheel.

Equitable ownership of Wagon Wheel was in the debtor on the date he filed for relief under Chapter 7 and became part of the property of his estate which must be turned over to the plaintiff herein.

Settle judgment.