Beatrice Shainswit, J.
This is a suit for breach of contract, where plaintiff’s contractual rights are conceded, the breach is virtually confessed, but meaningful recovery is opposed. Defendants are two corporations — a parent and a wholly owned subsidiary — who seek to capitalize on the shell game they played with plaintiff, putting corporate responsibility for the performance due plaintiff under their different peas whenever it suP^ their purposes. Then defendants delivered what they thought was a remediless blow, by having the parent dispose of all the assets of the subsidiary, and seeking to confine the plaintiff to a futile judgment against the stripped subsidiary.
The maxims of corporate insulation, however, do not have the 100% rigidity suggested by defendants. Like most substantive law concepts, the general rules in the fields of corporate law and contracts are qualified by carefully preserved exceptions, to permit the rendition of justice in the exceptional situation. A nisi prius Judge therefore has a threshold duty to be sensitive to the existence of the exceptional circumstances which call for the exceptional decision. This is such a case, and I make such an exceptional determination.
These are the facts:
Plaintiff .sues defendant Computech, Inc. (now known as 575 Computer Services, Inc.), and its .sole stockholder, defendant International Systems Associates, Ltd., for failure to supply computer time owed plaintiff under a contract originally entered into on August 27, 1969.
Defendant Computech, Inc. was the owner, or lessee from International Business Machines, of various data processing compaters; in particular, it owned two computers known by the designation “ 360”, and one known as “ 1460 Prior to August, 1969, plaintiff had regularly rented the services of both types, on an hourly basis. On August 27, 1969, plaintiff bought-the 1460 computer from Computech for $60,000, under a contract whereby plaintiff also assumed Computech’s lease of various components of the machine. In addition, by letter accompanying the contract — and signed by both parties — plaintiff received, as further consideration, the right for one year, beginning August 22, 1969, to “50 hours of free computer time *604 (except for supplies) on your IBM 360, at such times as are convenient to you.” Plaintiff’s president testified — and I credit his testimony — that the $60,000 price was $5,000 more than that originally negotiated for, and that it was raised because of Computech’s need for cash, and specifically in return for the 50 hours’ free time.
Thereafter, plaintiff’s president testified — and I again fully credit his testimony — that Computech became extremely uncooperative on providing this IBM 360 time. I find that plaintiff (a) had great need for the computer, (b) was willing to use it at any hour — day or night — and in as small or large units as Computech desired, and (c) was amenable to any schedule Computech desired. Nevertheless, the evidence was plain that the 360 almost never was made available between August, 1969, when the contract was entered into, and December, 1970 (which included four extra months Computech itself had voluntarily offered by letter). The upshot was that plaintiff was able to obtain use of the 360 (which was located in Computech’s office) for only 16.8 hours, instead of the 50 owed.
Defendants were fully aware of plaintiff’s dissatisfaction. In a statement sent plaintiff by Computech, dated October 16, 1970, Computech admitted owing 33.2 hours to plaintiff. Moreover, a letter from Computech to plaintiff, dated May 6, 1970, sought to limit plaintiff’s usage of the 360 to five hours per month, with the total period extended to December 31, 1970. A prompt reply letter by plaintiff’s counsel, dated May 8, 1970, pointed out that there had been no such five-hour limitation originally, and rejected it. In addition, the letter spelled out in detail the problems plaintiff had been encountering with Computech, and asked that a schedule be set for the hours due it. Computech never denied that these problems had occurred. On the contrary, in a letter dated May 22, 1970, Computech’s president referred to a meeting with plaintiff’s president, “ the beginning of a new era in their relationship,” and asked to be notified should plaintiff “ run into any further difficulties.” Withal, almost nothing appears to have been done to ease those difficulties. Instead, having lulled plaintiff into a false sense of contractual security, the stage was set by defendants to later mock plaintiff’s contractual rights.
There is thus no question whatever as to the breach; indeed, defendant’s sole witness on the trial, the president of Computech’s parent company, never denied any of plaintiff’s allegations as to the breach.
*605 Nor is there any doubt that all parties intended the contract provision for use of the 360 “ at such times as are convenient ” to Computech to be read by the rule of reason common to all contracts. (Brown v. MaGraw-Hill Book Co., 25 A D 2d 317, 320 [1st Dept., 1966], affd. 20 N Y 2d 826.) The contract did not — and in law could not — place Computech in a position to destroy plaintiff’s rights or in any way negate the contract. Implicit in all contracts, is a covenant of fair dealing, an implied promi&e to do nothing which will injure the right of the other party to receive the fruits of the contract. (Pernet v. Peabody Eng. Corp., 20 A D 2d 781 [1st Dept, 1964]; 10 N. Y. Jur., Contracts, § 203 and cases cited.) Certainly, the contract provision here contained that implied covenant, and equally certainly, defendants breached it,
I fully credit plaintiff’s president’s testimony that he gave defendants every possible opportunity to perform and that his requests were reasonable. The record is plain that plaintiff’s inability to use the 33.2 hours was due entirely to Computech’s absolute failure to co-operate, as dictated by its parent, defendant International Systems Associates, Ltd. (ISA). ISA’s president acknowledged that it considered other, noncompetitive .customers more important, and that it regretted having entered 'into this arrangement, since plaintiff was now the owner of a ¡1460, in some ways a competing machine.
In January, 1970 — some five months after plaintiff and Computech entered into the instant contract — all of Computech’s stock was purchased by defendant ISA. Although the two companies remained at separate addresses, ISA proceeded to designate a new president and treasurer in charge of Computech, and to replace all of the directors with the members of its own board of directors. The president it placed in charge of Computech, Sherman Lachs, reported to the then president of ISA (Paul Goldner, who was the sole witness for both defendants on the trial).
Mr. Goldner testified that: (a) he was fully aware of the difficulties with plaintiff, (b) he constantly conferred with Mr. Lachs about them, (c) Mr. Lachs had no experience in the business, and therefore ISA, through Goldner himself, exercised decisive and actual control over Computech, particularly in regard to the contract involved herein, (d) ISA committed itself to recognize and honor the binding legal and moral force of the 50-hour obligation to plaintiff, even though ISA had not been made aware of it by Computech at the time of purchase, (e) he knew about the May 22, 1970 letter by Lachs to plain *606 tiff, and about the fact that the difficulties continued thereafter, and (fi) insofar as plaintiff’s contractual rights were concerned, Computech and Lachs acted as alter egos of ISA’s president (Goldner), who alone issued fiats as to when the 360 would be available or unavailable to plaintiff. This latter admission is of decisive importance in this case. All in all, Mr. Goldner himself dispelled all doubt that he was the moving spirit in both companies, and the decisive figure on the relationship with plaintiff.
One year after ISA’s purchase of Computech — the investment apparently having proved a poor one — all of the operating assets of Computech were sold to an outside company for $150,000, and were actually moved to the offices of the purchaser. Computech’s name was changed to 575 Computer Services, Inc., and the company remained in existence only as a shell to hold a nonoperating asset, worth under $100, The stock continues in ISA’s name and possession. The $150,000 was, according to defendant’s witness, Goldner, used to pay Computech’s debts, and plaintiff was left out in the cold.
Accordingly, the instant suit was filed against both defendants on March 10, 1971. A default judgment entered against ISA was vacated for faulty service, in December, 1971, and ISA then answered.
In an affidavit by Mr. Goldner, in seeking to vacate the default, he averred: “At the time defendant purchased the stock of Computech, Inc., defendant agreed to allow plaintiff to use a certain amount of computer time if plaintiff notified defendant within a reasonable period of time and such time were available. Plaintiff’s right to request the use of computer time expired in December 1970.” Mr. Goldner’s affidavit contradicts ISA’s later posture at trial. The affidavit acknowledges that ISA had become the prime actor in defining and controlling performance of plaintiff’s contractual rights, and that it was ISA which was directly responsible for the unabashed breach of contract.
One final fact of interest: ISA’s exercise of dominion over the performance at issue was so pervasive and so complete that, in its dealings with plaintiff, it even meshed Computech’s original contract with a contract that had originated with ISA. Plaintiff’s president testified, and defendant ISA’s former president confirmed, that in December, 1970 plaintiff had called the president of Computech to complain about the failure of its parent company, ISA, to pay $450 owed plaintiff on another, unrelated contract, referred to below. Computech’s president thereupon *607 handed the telephone to ISA’s comptroller, who was seated with him; the latter then told plaintiff’s president that ISA would not pay the $450 it owed unless plaintiff paid the $200 owed to Oomputech on a third contract involved herein, the one on which defendants counterclaim, and as to which there is no dispute. In this setting, the imprinted bottom line on all of the letters from Oomputech to plaintiff, reading: “An International Systems Associates, Ltd. Company ”, scarcely does justice to the full degree to which ISA ruled every facet of the relationship with plaintiff.
In short, on this record, I find that the parent company, ISA, was the most important actor at every critical stage of this transaction. It exercised dominion over the performance of the contract, and became the ultimate arbiter of the extent to which performance was to be discharged. I conclude that, ISA having intruded its own values, policy judgment, and edicts as to the conditions and extent of performance, in every literal and pragmatic .sense, ISA cannot escape responsibility for the role that it played.
In such a situation, the law will not allow the corporate structure to stand in the way of justice and equity. As Judge Cardozo long ago said, in language that fits our factual fabric like a glove, this was ‘ Dominion * * * .so complete, interference so obtrusive ” that it would be a perversion of justice to permit the dictatorial parent to thumb its nose at the court. (Berkey v. Third Ave. Ry. Co., 244 N. Y. 84, 95 [1926].) And almost simultaneously, Judge Learned Hand announced (Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F. 2d 265, 267 [C. C. A. 2d, 1929]): “ One corporation may, however, become an actor in a given transaction, or in part of a business, or in a whole business, and, when it has, will be legally responsible.”
Whether the second corporation is denominated “ agent,” “ alter ego,” or “ instrumentality,” of the parent, the essential point is that the courts will not allow “a perversion of the privilege to do business in a corporate form ” (Berkey v. Third Ave. Ry. Co., supra, p. 95). Liability rests on the fact that the parent corporation has directly intervened in the transaction (Kingston Dry Dock Co. v. Lake Champlain Transp. Co., supra, p. 267). Whatever the rubric used, the courts in such a setting grant relief because there is “ a wrong for which the law must find a remedy.” (Lowendahl v. Baltimore & Ohio R. R. Co., 247 App. Div. 144, 156 [1st Dept., 1936], affd. 272 N. Y. 360).
Our situation meets the tests for application of the exception to the general rule as formulated in Lowendahl and its progeny. *608 There was domination and control — at least in regard to the contract with plaintiff — “ not * * * in a manner normal and usual with stockholders,” but so complete as to policy and business practice that the parent becomes the real actor in the transaction. (Lowenthal, 247 App. Div. 144, 155, supra.) The proximate result of that control was a clear legal wrong — the breach of plaintiff’s contract — and the parent corporation necessarily must bear the responsibility therefor.
As 38 ALE 3d 1102,1111-1112 (1971) recently summed it up: “ each additional factor tending to show too close or too direct a relationship between the corporations * * * greatly increases the likelihood of imposition of parental liability. In practical effect, the court disregards the separate entity of the subsidiary where the parent has done so, at least in cases where the parent did so in relation to the transaction in suit.”
To reiterate: On all of' the credible evidence, I find that ISA, equally with Computech, bears responsibility for the wrong inflicted on plaintiff. ISA dictated, and Computech genuflected, riding roughshod over plaintiff’s contractual rights.
Turning now to the damages to be awarded plaintiff: I find for plaintiff in the sum of $75 per hour for 33.2 hours.
Plaintiff’s president testified that the price he paid to obtain substitute machines for the 33.2 hours not provided by Computech ranged from $45 to $60 when he rented in bulk for a short period (he took 25 hours in two nights), and $75 for a single hour. Beyond this, plaintiff submitted paid bills from Computech itself for April, May and June, 1969 — just before he bought the 1460 in August — billing him for rental of both the 360 and the 1460. The rental of the 360 in nonprime time was $75 per hour, and in prime time $90 per hour, plus extra charges for supplies, copies, etc. The contract for 50 hours’ free time said nothing limiting plaintiff to nonprime time, it will be noted.
However, even limiting plaintiff to nonprime time, in view of (a) these uncontested written statements of Computech’s own charge for the 360, (b) the trouble plaintiff was caused — by constantly having to demand time, rarely having it made available when it was needed, and finally having to shop elsewhere for it — and (c) the testimony by plaintiff’s president, a qualified expert on value in this field, that the value at the time of the contract was $75 to $90 an hour — testimony which I credit — I find that $75 per hour is a reasonable measure of damages here. The amount thus owed plaintiff is $2,490.
There should be deducted from this, $200 which plaintiff concededly owes Computech on another contract, on which it has *609 counterclaimed. It is also conceded that defendant ISA owes plaintiff $450 on still a third contract. The addition of this amount to ISA’s liability brings the total due to $2,740.
Judgment is therefore directed in plaintiff’s favor against ISA in the sum of $2,740, and against Computech in the sum of $2,290. Interest shall he computed from January 1, 1971.
All motions disposed of accordingly.