Jasen, J.
 

 Until his death in July, 1973, the late Sol G. Atlas was actively engaged in the acquisition and development of real property. Atlas organized his various ownership and construction ventures into a complex network of separate corporations in which he had both a controlling interest and an active leadership role. This case involves the efforts of an independent subcontractor on an Atlas project to collect a money judgment it obtained against an Atlas controlled general contractor. Since the general contractor was virtually judgment proof due to certain financial manipulations, the subcontractor endeavored to enforce its judgment against other corporations allied with Atlas in the venture, as well as against Atlas’ estate. The trial court, by piercing the corporate veil of the various corporate defendants and holding that the subcontractor was a third-party beneficiary of contracts between these Atlas corporations, granted the relief sought. The Appellate Division affirmed, placing primary reliance upon the third-party beneficiary theory. While we disagree with the theories developed by the courts below, we are in accord with the result reached. In our view, the subcontractor was entitled to enforce its money judgment against the defendant corporations and the estate of Sol G. Atlas through a special proceeding authorized by CPLR article 52. Since all necessary parties are before the court, the court may convert the plenary action into a special proceeding (CPLR 103, subd [c]; see
 
 Kovarsky v Housing & Development Admin.,
 
 31 NY2d 184;
 
 Matter of First Nat. City Bank v City of New York,
 
 36 NY2d 87) and, on
 
 *654
 
 that basis, we would, affirm the order of the Appellate Division.
 

 In 1956, defendant Essex Green, Inc. (Owner), the owner of a 48-acre tract in New Jersey, entered into a written contract with defendant Essex Construction Corp. (Contractor) for the construction of an $8,000,000 shopping center on its property. Both corporations were allied with various Atlas interests. The Contractor agreed to supply all labor and materials necessary for the work in return for a nominal fee of $5,000. The contract further provided that the Owner should reimburse the Contractor in current funds for all costs necessarily expended or incurred in the prosecution of the work. This provision, known in the construction industry as a "cost plus a fixed fee” clause, stated that:
 

 "5. The Owner shall reimburse the Contractor in current funds for all costs necessarily expended and or incurred for the proper prosecution of the work, such costs to include and to be limited to the following items:
 

 * * *
 

 "(c) Amounts of all sub-contracts;
 

 * * *
 

 "8. The Contractor shall, on or before the tenth day of each month deliver to the Owner a statement, sworn to if required, showing in detail and as completely as possible all moneys paid by it on account of the cost of the work during the previous month for which it is to be reimbursed under paragraph numbered 5 hereof. Such statements shall be checked by the Owner immediately upon the receipt thereof and the moneys shown to be due therein, subject to any corrections made as a result of said check, shall be paid on or before the fifteenth day of each month after the receipt of said statements by the Owner.”
 

 In 1957, the general contractor entered into a subcontract with plaintiff for performance of all electrical work on the project. The subcontract referred to certain provisions of the general contract that were to be incorporated therein. A clause provided for submission of controversies and claims to arbitration. Plaintiff completed its work in May, 1958, received a substantial amount on its contract and made a claim of $96,940 for extra work performed. The Contractor resisted the claim and counterclaimed for approximately $52,000 in offsets. When the parties were unable to reach an accommoda
 
 *655
 
 tion, plaintiff, in December, 1960, pursuant to the subcontract, demanded arbitration. The arbitration proceeding was unusually protracted. The plaintiff finally prevailed in June, 1966 and received an award of $73,000, plus interest. The award was confirmed by the Supreme Court and judgment was entered for $105,011 in favor of the plaintiff.
 

 Plaintiff’s efforts to collect its judgment against the Contractor were unsuccessful. As a result of certain financial manipulations directed by Atlas, the assets of the venture, the bulk of which had previously been lodged in the Owner, were transferred to Atlas and to his other allied corporations. Both the Owner and the general contractor were rendered virtually judgment proof. The plaintiff, to enforce its judgment, commenced this action against the defendant corporations which ended up with the assets, the estate of Atlas, and the Owner. In granting recovery to the plaintiff, Trial Term held that as a third-party beneficiary of the general contract, the plaintiff could enforce the Owner’s obligation to pay the cost of the work performed under the electrical subcontract. The court also placed liability on the Owner by piercing its corporate veil. The Appellate Division affirmed, agreeing generally with the reasoning of Trial Term and noting particularly that plaintiff was a third-party creditor beneficiary. It also observed that the June, 1966 arbitration award, which formed the basis for the judgment under review, was never contested by any of the defendants, despite the active, personal participation of Atlas in the arbitration proceeding and the obvious right, for himself and on behalf of the other defendants, to contest.
 

 We do not agree that the plaintiff is a third-party creditor beneficiary of the contract between the owner, Essex Green, Inc., and the general contractor, Essex Construction. It is old law that a third party may sue as a beneficiary on a contract made for his benefit.
 
 (Lawrence v Fox,
 
 20 NY 268; 17A CJS, Contracts, § 519 [3]; 10 NY Jur, Contracts, § 237.) However, an intent to benefit the third party must be shown
 
 (Beveridge v New York El. R. R. Co.,
 
 112 NY 1, 26;
 
 Cerullo v Aetna Cas. & Sur. Co.,
 
 41 AD2d 1), and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts.
 
 (Associated Flour Haulers & Warehousemen v Hoffman,
 
 282 NY 173, 180;
 
 Moch Co. v Rensselaer Water Co.,
 
 247 NY 160; Simpson, Contracts, § 117.) Difficulty may be encountered, however, in applying the intent to benefit test in construction contracts because of the multiple
 
 *656
 
 contractual relationships involved and because performance ultimately, if indirectly, runs to each party of the several contracts. Hence, interpretational difficulties prevalent in third-party beneficiary contracts are compounded as a result of the peculiar problems presented by construction contracts.
 

 Generally it has been held that the ordinary construction contract—i.e., one which does not expressly state that the intention of the contracting parties is to benefit a third party —does not give third parties who contract with the promisee the right to enforce the latter’s contract with another. Such third parties are generally considered mere incidental beneficiaries.
 
 (Cerp Constr. Co. v J. J. Cleary, Inc.,
 
 59 Misc 2d 489, affd 31 AD2d 784;
 
 International Erectors v Wilhoit Steel Erectors & Rental Serv.,
 
 400 F2d 465;
 
 Watson v American Creosote Works,
 
 184 Okla 13; see 4 Corbin, Contracts, § 779D.) The text writers have uniformly designated these third parties only as incidental beneficiaries and not infrequently have posited the situation wherein the subcontractor sues the owner as an example of an action by an incidental beneficiary. (4 Corbin, Contracts, § 779D; Restatement, Contracts, 2d, § 133, Illustration 18 [Tent Draft No. 4, 1968]; 2 Williston, Contracts [3d ed], § 402; Simpson, Promises Without Consideration and Third Party Beneficiary Contracts in American and English Law, 15 Int & Comp LQ 835, 856.)
 

 In this case, we cannot conclude from the record before us that the Contractor and the Owner intended that their contract run to the benefit of the subcontractor. Thus, it cannot be said that the subcontractor was a third-party beneficiary of that contract and the courts below erred in predicating liability on that theory.
 

 Nor was it appropriate, in this case, to disregard the corporate forms and pierce the corporate veils. Corporations, of course, are legal entities distinct from their managers and shareholders and have an independent legal existence. Ordinarily, their separate personalities cannot be disregarded.
 
 (Rapid Tr. Subway Constr. Co. v City of New York,
 
 259 NY 472, 487-488.) In a broad sense, the courts do have the authority to look beyond the corporate form where necessary "to prevent fraud or to achieve equity”.
 
 (International Aircraft Trading Co. v Manufacturers Trust Co.,
 
 297 NY 285, 292.) More specifically, where a shareholder uses a corporation for the transaction of the shareholder’s personal business, as distinct from the corporate business, the courts have held the
 
 *657
 
 shareholder liable for acts of the corporation in accordance with the general principles of agency. (See
 
 Rapid Tr. Subway Constr. Co. v City of New York, supra; Berkey v Third Ave. Ry. Co.,
 
 244 NY 84, 95.) The determinative factor is whether "the corporation is a 'dummy’ for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends.”
 
 (Walkovszky v Carlton,
 
 18 NY2d 414, 418.)
 

 Here, the external indicia of separate corporate identities were at all times maintained.
 
 (Bartle v Home Owners Coop.,
 
 309 NY 103, 106.) The fact that Sol Atlas was the controlling principal of these corporations is, by itself, insufficient to justify disregarding the corporate form. Since Atlas himself carefully respected the separate identities of the corporations, and each corporation was pursuing its separate corporate business, rather than the purely personal business of Atlas, we conclude that the corporate veils of the defendant corporations should not be "pierced”.
 

 All of this, of course, does not end the matter. A money judgment may be enforced against a debt which is past due or which is yet to become due. (CPLR 5201, subd [a].) Moreover, CPLR article 52 authorizes the court, upon a special proceeding brought by the judgment creditor, to compel any debtor of the judgment debtor to pay the debt, or so much of it as will satisfy the judgment, to the judgment creditor. (CPLR 5227.) Thus, in this' case, the plaintiff, as a judgment creditor of the Contractor, may enforce debts or obligations owed to the general contractor by other persons or corporations.
 

 In the general contract, the Owner promised to reimburse the Contractor for the "amount of all sub-contracts”. After the arbitration award was reduced to judgment against the Contractor, the Contractor was entitled to reimbursement from the Owner for the amount of the judgment. The Contractor’s right to reimbursement from the Owner may be enforced by plaintiff since plaintiff is the judgment creditor of the Contractor. In a similar fashion, plaintiff may enforce any other cause of action that the judgment debtor contractor may possess against the other defendants, to the extent of satisfying the amount of the judgment.
 

 The record establishes that the Owner was denuded of its assets as the result of asset transfers to other corporations and to Atlas himself made prior to September 1, 1963. The trial court found that these transfers constituted "intentional
 
 *658
 
 preferred payments made to ostensible creditors without taking into consideration the fact that plaintiff too was a creditor of [the Owner].” For example, during May or June of 1963, the Owner paid $230,000 of debt it owed to Sol G. Atlas Realty, Inc., one of the defendants in this case. All of the preSeptember 1, 1963 transfers were made in violation of then effective provisions of the Stock Corporation Law. Section 15 of that statute prohibited corprations that are insolvent or whose insolvency is imminent from transferring corporate property with the intent of giving a preference to particular corporate creditors. The statute also authorized a creditor of the corporation to compel both transferees and corporate officers to account for any prohibited transfers. Since assets of the Owner were transferred in a preferential fashion to other creditors, the Contractor, as a creditor of the Owner whose rights were thereby frustrated, had the right to compel Atlas and the transferee "corporations to account for assets they received and to compel Atlas to account for the transfers which he authorized as an officer of the Owner. The Contractor had a cause of action against Atlas and his corporations, and the plaintiff, as a judgment creditor of Contractor, may enforce that cause of action pursuant to CPLR article 52. Since the amount of the illegal transfers is in excess of plaintiff’s judgment, the plaintiff is entitled to a full recovery from the defendants. The presentation of any potential issues with respect to the apportionment of liability .between the defendants and of possible offsets that might work to reduce the amount of the causes of action which plaintiff may enforce have been waived. The defendants failed to assert such issues, even in an analogous form, at any time despite the active involvement of all defendants, particularly Atlas and his personal representatives, in all phases of this extensive litigation.
 

 We would, therefore, affirm the order of the Appellate Division.
 

 Chief Judge Breitel and Judges Gabrielli, Jones, Fuchs-berg and Cooke concur; Judge Wachtler taking no part.
 

 Order affirmed, with costs.