Jean–Louis DAVID, Plaintiff,

v.

The GLEMBY COMPANY, INC. and Hair Programming, Inc., Defendants.

No. 86 Civ. 8096 (JMW).

United States District Court, S.D. New York.

July 7, 1989.

Douglas Capuder, Douglass Wistendahl, Wistendahl & Folkenflik, New York City, for plaintiff.

Alan F. Goott, Kaye, Scholer, Fierman, Hays & Handler, Donald B. Jacobson, The Glemby Co., Inc., New York City, for defendants.

## OPINION AND ORDER

WALKER, District Judge.

### I. Introduction

Plaintiff Jean–Louis David ("David") sues defendants the Glemby Company ("Glemby") and Hair Programming, Inc. ("HPI") for equitable relief and monetary damages for breach of a contract executed by David and HPI. HPI is a 98% owned subsidiary of parent Glemby. The action arises from defendants' undisputed failure to establish a number of hairdressing salons in the United States under plaintiff's name. Currently before the Court are defendants' motions for summary judgment on two issues. First, Glemby—the parent of HPI—moves for summary judgment to preclude David from piercing the corporate veil. Second, both defendants move for summary judgment on the issue of causation and damages. They argue that most of the damages claimed by plaintiff (1) must be held as a matter of law not to have

been caused by defendants' actions since a New York rule bars recovery of lost profits by new businesses, and (2) are too speculative in any event. For the reasons discussed below, defendants' motions are granted in part and denied in part.

## II. Background

In 1976, Jean–Louis David, a successful French hair stylist, entered into a licensing agreement in the United States with Yvette, a company owned by defendant Glemby. Glemby, controlled by the Finkelstein family, operates some 1,400 beauty salons in department stores across the country through subsidiaries like Yvette. Under this 1976 agreement—not directly at issue in this case—Yvette converted the salon which it had been operating at the Henri Bendel store in Manhattan to a "David" salon. Two years later, David and Yvette formed HPI, which took over operation of the Bendel salon and also operated four free-standing David salons. The free-standing salons fared poorly, and in 1980 David withdrew from HPI; David surrendered his shares to Yvette but licensed HPI to continue operating the David salon at Bendel. Under this arrangement, Yvette indemnified David against any liabilities of HPI.

In October 1982, after much discussion, defendants and David entered into the two agreements at issue. In the first agreement, the so-called "Market Development Agreement," David licensed HPI to operate a David salon in the I. Magnin department store in Beverly Hills, California. HPI also agreed to open three additional David salons in other cities by August 31, 1985 and to execute specific agreements for these salons by August 31, 1984. HPI agreed to operate all four salons until 1988, with an option for two additional terms of two years each. HPI was also required to pay for several pages of advertisements each year in Vogue magazine, promoting David salons. In the second agreement, the so-called "Know–How Agreement" between David and Glemby, signed at the same time, David agreed to furnish training and consulting services to Glemby for use in Glemby's hundreds of department store salons; however, Glemby was not licensed to use David's name in connection with these other salons.

While the two agreements stand alone, each refers to provisions of the other, and plaintiff maintains that the two represented a "comprehensive agreement." P. 3(g) Veil, ¶ 14.[1] *See also* P.Mem. at 21. Indeed, each agreement provides for termination by a party if the other agreement is terminated. Although the agreements themselves are largely silent on the subject, there is nonetheless some evidence to support plaintiff's claim that one of his primary objectives in having HPI set up several David salons was to test how his marketing approach, so successful in France, would work in the U.S. and whether it would require adjustment.

David then planned to sell a large number—576—of franchises for David salons in this country, as he had successfully done in France and Italy. According to plaintiff, he received a promise from Glemby that it would ensure that HPI performed the latter's obligations under the Market Development Agreement. P. 3(g) Veil, ¶ 17. On the same day as these agreements were signed, HPI assigned to Sophia of California, another subsidiary of Glemby, its rights under the Market Development Agreement. Sophia also assumed HPI's obligations under the agreement. This assignment was made without notice to David, even though the agreement itself prohibited such assignment. P.Mem. at 35–36, and P.Exh. E, ¶ 10, and Exh. JJ.

Affairs did not progress as the parties had planned. The salon at I. Magnin fared

---

**1.** References throughout this Opinion are as follows: Plaintiff's Statement Pursuant to Rule 3(g) on the Issue of Piercing the Corporate Veil ("P. 3(g) Veil"); Plaintiff's Memorandum in Opposition to Summary Judgment ("P.Mem."); Plaintiff's Complaint ("Comp."); Defendants' Motion for Summary Judgment on Issues of Causation and Damages ("D.Mem. Cause"); Defendants' Reply Memorandum ("D. Reply"); Plaintiff's Exhibits in Opposition to Summary Judgment ("P. Exh."); Defendants' Exhibits in Support of Motions for Summary Judgment ("D.Exh.").

poorly, and in 1985 I. Magnin instructed HPI to drop the format. Meanwhile, HPI missed the 1984 and 1985 deadlines to open three other David salons and failed to open these salons even after obtaining an extension of the August 1985 deadline of several months.

In October 1986, David brought suit seeking declaratory and injunctive relief, including specific performance, and for damages.[2] Defendants denied the allegations and asserted certain counterclaims not at issue here. Plaintiff, based on the affidavits of expert witnesses, first asserted a claim for damages of $20 million, that was later revised to $8.5 million. These damages represented David's expected profits from the franchises which he planned to sell after the four prototype salons operated by HPI had allowed him to assess the U.S. market and to establish his trade name in this country. D.Exh. H, and P.Mem. at 45–48. In his complaint and supporting materials, David seeks to hold Glemby responsible for HPI's liabilities under the Market Development Agreement, alleging that Glemby so dominated and controlled HPI as to justify treating the two as one corporation.

Glemby now moves for summary judgment on the issue of piercing the corporate veil, and both defendants move for summary—judgment on the issue of causation and damages. Each motion will be addressed in turn.

### III.  Discussion

■ Summary judgment, of course, is appropriate only where "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c). In evaluating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). At the same time, however, the nonmoving party may not simply rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judg-

ment." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Fed.R.Civ.P. 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (citation omitted).

### A.  Piercing the Corporate Veil

In its complaint, David asserted that Glemby "controls Defendant HPI," and had "promised to take all actions to permit and encourage Defendant HPI to fulfill its obligations" under the Market Development Agreement and that therefore "Defendant HPI is the alter ego of Defendant Glemby and the corporate veil of HPI may be pierced and Defendant Glemby, as the shareholder of HPI, is responsible for all liabilities and obligations of HPI with respect to Plaintiff's request for damages." Complaint, ¶¶ 7, 17, 29(c).

In its motion for summary judgment on this issue, Glemby asserts that the standard in this jurisdiction for piercing the corporate veil requires plaintiff to show not only that HPI was the "mere instrumentality" of Glemby, but also that Glemby used its subsidiary to perpetrate fraud, resulting in an unjust loss to David. Glemby argues that plaintiff can prevail on neither of these points: HPI was no "mere instrumentality," but rather a functioning corporate entity distinct both formally and practically from its parent, and David was in no way defrauded, since he clearly knew about the corporate relationship between Glemby and HPI and still contracted with them separately in the two agreements. Plaintiff counters that Glemby has so thoroughly dominated HPI's activities that a jury could find that Glemby was the real actor in the Market Development Agreement and that its actions have resulted in an unjust loss to plaintiff which is all that the law requires.

**2.** Equitable remedies are not at issue on these        motions.

Previous decisions in New York courts and in this circuit have left the law not entirely clear as to when a party may pierce the corporate veil and hold a parent corporation liable. Generally, the cases hold that there is a " 'presumption of separateness' afforded to related corporations." *Williams v. McAllister Bros., Inc.*, 534 F.2d 19, 22 (2d Cir.1976) (citation omitted), leading to a "reluct[ance] to disregard the separate existence of related corporations by piercing the corporate veil." *Kashfi v. Phibro–Salomon, Inc.*, 628 F.Supp. 727, 732–33 (S.D.N.Y.1986). When courts have done so, it has been " 'to prevent fraud or to achieve equity.' " *Port Chester Elec. v. Atlas*, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 331, 357 N.E.2d 983, 987 (1976) (citation omitted).

■ However, "disregarding corporate separateness ... differs with the circumstances of each case." *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). While piercing the corporate veil is characterized as an equitable remedy, it rests on a factual inquiry; as a result, "the issue of corporate disregard is generally submitted to the jury." *American Protein Corp.*, 844 F.2d at 59; *see also Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 53 (2d Cir.1984) (listing appropriate criteria for jury to use in deciding if corporate veil should be pierced). Thus, it is safe to say that while there is a "presumption of separateness," there is also a presumption against summary judgment.

Against this backdrop, courts have generally, if somewhat variably, applied a two part test. The first asks if the subsidiary was so dominated by its parent as to be a "mere · instrumentality." As Judge Learned Hand explained,

> One corporation may ... become an actor in a given transaction, or in part of a business, or in a whole business, and, when it has, will be legally responsible. To become so it must take immediate direction of the transaction through its officers.... [L]iability normally must depend upon the parent's direct interven-

tion in the transaction, ignoring the subsidiary's paraphernalia of incorporation, directors and officers. The test is therefore rather in the form than in the substance of the control; in whether it is exercised immediately, or by means of a board of directors and officers, left to their own initiative and responsibility in respect of each transaction as it arises. *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir.1929).

The second part of the test, found in many of the cases, is the requirement that this domination of a subsidiary by its parent result in some fraud or inequity to plaintiff. The corporate entity, then, should be disregarded "where such control has been used by the parent to ... violate [a] legal duty, or has been used to do an act tainted by dishonesty or unjust conduct violating the plaintiff's rights or under circumstances giving rise to an estoppel." *Lowendahl v. Baltimore & Ohio RR*, 247 A.D. 144, 157, 287 N.Y.S. 62 (1st Dep't), *aff'd* 272 N.Y. 360, 6 N.E.2d 56 (1936); *see also Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir.1985). Some courts have required that the parent company have used its subsidiary to perpetrate fraud. *See Kashfi v. Phibro Salomon, Inc.*, 628 F.Supp. at 735 ("[T]he test for piercing the corporate veil also requires a showing that the dominated corporation was used to commit a fraud"); *American Protein Corp. v. AB Volvo*, 844 F.2d at 60 ("[S]uch domination must have been used to 'commit fraud or wrong' against plaintiff, which proximately caused plaintiff's injury") (citation omitted). Other decisions have explicitly held that domination leading to "a dishonest and unjust act in contravention of plaintiff's legal rights" is sufficient, *Gorrill v. Icelandair/Flugleidir*, 761 F.2d at 853, that breach of a contract by a dominated subsidiary is an adequate wrong to justify piercing the veil, *Data Probe, Inc. v. 575 Computer Services, Inc.*, 72 Misc.2d 602, 340 N.Y.S.2d 56, 62 (Civ.Ct., N.Y.Cty.1972), or that the domination need not be causally connected to fraud or a wrong, *Brunswick Corp. v. Waxman*, 599 F.2d 34, 35 (2d Cir.1979) ("[W]e are dubious

that ... the plaintiff need establish that the Waxmans committed a fraud on Brunswick and that there be causal connection between the fact that the Waxmans conducted business individually and the contract losses suffered by Brunswick"). *See also Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.1979).

▉ In light of the foregoing authorities, the facts of this case, viewed in the light most favorable to the nonmovant, suggest that summary judgment is inappropriate on the issue of piercing the corporate veil.[3] The evidence before the Court is not conclusive. A jury could reasonably find that the corporate veil of HPI should be pierced. While HPI observed many of the formalities of corporate form, it ignored others. HPI apparently did not fully comply with its own Articles or BCL § 602(b), both of which require annual meetings. P.Mem. at 45 and P.Exh. 10, Article III(10). The two companies had essentially the same officers, a criterion which courts have often considered necessary, although not sufficient, for piercing the veil. *See, e.g., Kingston Dry Dock*, 31 F.2d at 267; *Port Chester v. Atlas*, 389 N.Y.S.2d at 331, 357 N.E.2d 987.

The correspondence and internal memoranda of Sydney and Andrew Finkelstein, who largely control Glemby and HPI, suggest that they often acted on behalf of both companies simultaneously; indeed, at times it is unclear for which of the two corporations they are speaking. Letters apparently written on behalf of HPI appeared on Glemby letterhead and referred ambiguously to "our obligation." *See, e.g.,* P.Exhs. H, K, and L. In memoranda, the Finkelsteins regularly referred to Glemby and HPI interchangeably or referred to both as "our Company." P.Exhs. HH, G. More generally, the depositions and documents amassed by both parties suggest that in practice Glemby often observed the corporate formalities of its subsidiaries in only a cursory fashion. *See* D.Exh. 15 at 24–31, 218, 675–78; P.Exh. NN. Significantly, and as just one example, the salaries of HPI employees at the Bendel salon were paid by another Glemby subsidiary. Itier Aff. ¶ 22.[4]

In their motions, both Glemby and David make much of the so-called Sophia Agreement, whereby HPI assigned to Sophia, Glemby's California subsidiary, the rights to the David trademark, even though such an assignment was prohibited by the Market Development Agreement. Plaintiff argues that this assignment, made without notice to David and against a contractual provision, "cannot be anything other than bad faith, and certainly demonstrates the absolute control of Glemby over Hair Programming with respect to this transaction." P.Mem. at 37. Glemby in turn argues that this assignment was necessary since HPI was not licensed in California and so could not operate the David salon in Beverly Hills as the Market Development Agreement required. Any alleged necessity aside, Glemby's point ignores the fact that Sophia was a subsidiary not of HPI, but of Glemby, and the assignment is evidence of performance of the contract by Glemby.

Glemby also argues that, since David had once owned 50 percent of HPI, David knew that HPI was a corporation distinct from Glemby. What Glemby ignores, however, is that David had relinquished his interest in HPI several years before the 1982 agreements. Moreover, David had no reason to believe HPI's function was to avoid liability

---

**3.** While defendant Glemby remarks in a footnote that "David would have to pierce both the HPI and the American Yvette corporate veils in order to impose liability on Glemby Co.," D.Mem. at 2 n. 2, neither party has considered this significant, and it does not appear to be so. Certainly Yvette has played almost no role in the agreements at issue. Moreover, as the discussion below suggests, Glemby has hardly been scrupulous about observing the boundaries of corporate entities. Yvette assumes almost no corporate existence in the briefs or in the underlying exhibits in this action. In such a context, there is no reason to assume a jury would not find it reasonable to pierce both veils in order to hold Glemby liable.

**4.** In addition, the David salon at I. Magnin in Beverly Hills was run by an executive not of HPI, which was to operate the salon, but rather of Glemby's California subsidiary. Itier Aff. ¶ 23.

for Glemby, especially in light of David's allegations that "Glemby promised Mr. David that it would take all steps necessary to see that Hair Programming performed the obligations stated in the Market Development Agreement, which Hair Programming signed, on instructions from Glemby." P. 3(g) Veil, ¶ 17.

As a jury could find that HPI was, in practice, the mere instrumentality of Glemby, so a jury could reasonably find that this resulted in an unjust loss to the plaintiff. As the court in *Data Probe, see supra,* explained,

> the parent company, ISA, was the most important actor at every critical stage of this transaction. It exercised dominion over the performance of the contract.... ISA cannot escape responsibility for the role that it played.... The proximate result of that control was a clear legal wrong—the breach of plaintiff's contract—and the parent corporation necessarily must bear the responsibility therefor.

340 N.Y.S.2d at 61–62.[5] With the denial of Glemby's motion to avail itself of HPI's corporate shield, we now turn to the *extent* of the unjust loss which plaintiff claims to have suffered.

### B. Causation and Damages

Plaintiff has set forth a revised damage claim of $8.5 million, representing the royalty payments for the many franchises which David has not sold, allegedly as a result of defendants' failure to set up the prototype salons.[6] In addition, plaintiff asserts damage claims representing the cost of setting up replacement salons, unpaid amounts due in 1988 under the Know–How Agreement, the lost royalty income that would have been provided by the salons the defendants promised to open, attorneys fees in this action, and amounts which plaintiff asserts defendants were obligated to provide for advertising under the Market Development Agreement. Defendants have moved for summary judgment against the $8.5 million claim.

First, they maintain that there is no causation as to royalties from the planned franchise salons since New York's rule against lost profit claims by new businesses precludes David's claim for damages not arising directly from the contract. Second, defendants argue that plaintiff's calculation of damages is far too speculative, since it assumes that the prototype salons would be successful and that David would, as a result, be able to sell hundreds of equally successful franchises in this country.

### 1. Causation:

The bulk of plaintiff's damage claims is for loss of future profits. However, in a claim for loss of future profits, "the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of intervening causes." *Kenford Co., Inc. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 235 (1986). In *Kenford,* plaintiffs contracted with the county to manage for twenty years a new domed stadium to be built near Buffalo. Plaintiffs hoped to profit from a number of related businesses, including a baseball franchise for the stadium and an office building development, as well as from the appreciation of surrounding land, much of which plaintiffs owned. The court stated that "[i]f it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost

---

5. Similarly, a jury could, based on the evidence already presented by the parties, conclude that the officers of Glemby and HPI displayed bad faith in not ensuring HPI's performance of the Market Development Agreement. *See Kashfi v. Phibro–Salomon,* 628 F.Supp. at 735; P. 3(g) Veil, ¶¶ 24, 25.

6. Actually, plaintiff's claim represents the present value of the three year lag time between a "no breach" scenario, in which defendants would have fulfilled the Market Development Agreement successfully, allowing David to sell his hundreds of franchises in the U.S., and a "breach" scenario, in which, due to defendants failure to perform, David, three years later, had to set up prototypes himself and *then* sell the franchises. *See* D.Mem. re Causation and Damages at 9–13; D.Exh. A.

profits with the requisite degree of reasonable certainty." *Id.* In a later decision in the same case, the Court of Appeals restricted the damages that may be recovered by a party for breach of contract. The Court permitted recovery only of those damages which were reasonably foreseeable or contemplated by the parties during their contract negotiations and barred recovery for the loss of the anticipated increase in the value of the surrounding land:

> [I]t is beyond dispute that at the time the contract was executed, all parties thereto harbored an expectation and anticipation that the proposed domed stadium facility would result in increased land values and increased property taxes.... We cannot conclude, however, that this hope or expectation of increased property values and taxes necessarily or logically leads to the conclusion that the parties contemplated that the County would assume liability for Kenford's loss of anticipated appreciation in the value of its peripheral lands if the stadium were not built.

*Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319–20, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989).[7]

### 2. The requisite certainty of losses

While courts have generally held that "the burden of uncertainty as to the amount of damages is upon the wrongdoer," *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir.1977); *see also U.S. Football League v. National Football League*, 842 F.2d 1335, 1379 (2d Cir.1988), this doctrine is obviously not without limits. Courts have required some certainty in assessing the general amount of lost profits. *See, e.g., Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d at 566 ("Courts draw the distinction between

proof of damages allowing the jury to make a 'just and reasonable inference' and 'pure speculation or guesswork' "); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). As Judge Friendly noted, " 'something more than a minimum of probative value' is required.... These comments are especially pertinent to an array of figures conveying a delusive impression of exactness in an area where a jury's commom sense is less available than usual to protect it." *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 912 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85, *reh. denied*, 370 U.S. 920, 82 S.Ct. 1552, 8 L.Ed.2d 500 (1962) (citation omitted).

■ Based on these standards, I find summary judgment to be warranted on the issues of causation and damages. Defendants cannot be held liable for David's delay in selling the planned salon franchises. While it is true, as plaintiff asserts, that the salon chain which David apparently planned was not wholly untried since David had a successful franchise business in Europe, that can not be the basis for establishing that David would have been equally successful in this country. Indeed, David himself acknowledged the difference in the markets when he contracted with defendant to set up the prototype salons for the purpose of assessing the suitability of David's marketing approach in the United States. The deposition of plaintiff's expert witness Edward Kushell, who calculated David's damages claim, reflects David's uncertainty on this score:

> [W]hen you have had some success in a market outside the United States, it does not always automatically insure success

---

7. While the most recent *Kenford* decision sets forth a stricter rule than previously articulated, prior cases—in both New York and federal courts—have also set forth high standards for when lost profits for new businesses can be awarded. These cases make clear that lost profit claims by new businesses must be certain, specific, and precise. *See, e.g., Hirschfeld v. IC Securities, Inc.*, 132 A.D.2d 332, 521 N.Y.S.2d 436, 439 (1st Dep't.1987), *appeal dism'd*, 72 N.Y.2d 841, 530 N.Y.S.2d 556, 526 N.E.2d 47 (1988) (holding that such damages could be recovered, but only if the plaintiffs were experienced in the business *and* if the lost profits could be ascertained with some certainty); *Perma Research & Development Co. v. Singer Co.*, 402 F.Supp. 881 (S.D.N.Y.1975), *aff'd* 542 F.2d 111 (2d Cir.), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1260 (2d Cir.1987); *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566–68 (2d Cir.1970); *For Children, Inc. v. Graphics International, Inc.*, 352 F.Supp. 1280, 1284 (S.D.N.Y.1972).

in this country. It oftentimes requires certain modifications and adaptations.

The purpose of the prototypes was to see what, if any, modifications were necessary to make them, and, to adapt it, so it would be more viable as a franchise in the United States.

D. Reply Exh. A at 33. Moreover, as plaintiff admits, the salons he contemplated for the United States were actually of a different type, and for a different—wealthier—clientele, than were the salons at Bendel or I. Magnin, for instance. This suggests that the prototype salons defendant failed to establish would have been of limited use to plaintiff in accurately assessing the American market for salon franchises.

Plaintiff asks that defendants bear the burden of uncertainty not only as to the success of the prototype salons, but also as to all future franchise salons David planned to sell. In cases such as *Autowest* and *For Children, see supra,* while defendants were held responsible for lost profits when they failed to deliver goods which plaintiff planned to resell, the damages awarded were specific to those goods for which the parties had contracted. No case has been found to suggest that defendants should be held responsible for *other* contracts that plaintiff would have made with *other* parties based on its earlier success. Indeed, the most recent *Kenford* opinion clearly indicates that the New York would bar plaintiff's claim for lost profits from the unsold franchises. The court stated:

Although the County was aware that Kenford had acquired and intended to further acquire peripheral lands, this knowledge in and of itself, is insufficient, as a matter of law, to impose liability on the County for the loss of anticipated appreciation in the value of those lands since the County never contemplated at the time of the contract's execution that it assumed legal responsibility for these

damages upon a breach of the contract.... Kenford voluntarily and knowingly assumed the risk that, if the stadium were not built, its expectations of financial gain would be unrealized. *Kenford Co. v. County of Erie,* 73 N.Y.2d at 320–21, 540 N.Y.S.2d 1, 537 N.E.2d 176.

Moreover, plaintiff's damage calculations, while extensive, *see* D.Exh H., are too speculative by the standard established in earlier cases. Plaintiff's calculations assumed not just that the *prototypes* would be successful, but also that their success would be so great as to allow David to sell 576 franchise salons of a different type and that each of *these* franchises would have survived and prospered. As the Appellate Division explained in *Kenford,*

Ordinarily, plaintiff may not recover for a collateral enterprise upon which he might have embarked, had defendant not breached the contract.... The office buildings, golf course, and theme park for which plaintiff now seeks lost profits were nothing more than visions at the time the parties entered into the contract.... The proposed baseball franchise was equally speculative. It was by no means certain Cottrell would have been able to purchase a baseball franchise.... Moreover, it is completely speculative to say that the franchise would have been a profitable one.

108 A.D.2d 132, 489 N.Y.S.2d 939, 942–43 (A.D. 4th Dep't.1985), *aff'd,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986).[8]

### C. Plaintiff's Additional Damage Claims:

Defendants also move for summary judgment on plaintiff's additional claims for damages, first asserted on the last day of discovery in its supplemental answer to defendants' interrogatories. These additional damage claims include attorneys' fees for costs in this action; the cost of setting up replacement prototypes; and the

---

**8.** In reaching the conclusion that summary judgment is appropriate on the issue of causation and damages for lost profits, It bears noting that plaintiff has not gone without some any compensation. Under the Know–How Agreement, Glemby has paid David over $1 million since 1982, and plaintiff himself argues that the

Know–How and Market Development agreements must be treated as a whole. P.Mem. at 21 n. 3. David's assertion that he has gone entirely without compensation is not entirely accurate. Simply put, he did not get that for which he did not explicitly bargain.

funds defendants were to provide plaintiff for advertising during the course of the agreement.

■ Defendants argue that this Court should reject these added claims as untimely. However, plaintiff's damages claim was, as defendants admit, filed within the discovery period, and Fed.R.Civ.P. 26(e)(2) requires only that a party "seasonably" amend its prior responses. This Court does not find that plaintiff's earlier responses to interrogatories were evasively incomplete, and the Court will not dismiss the additional claims as untimely asserted. Defendants also argue that plaintiff's three additional damages claims are each invalid as a matter of law and should be dismissed. The Court examines each claim in turn.

Plaintiff seeks "attorneys and litigation fees and costs of court through time of trial," estimated at approximately $400,000 as of November 1988. Of course, attorneys' fees are not ordinarily awarded in commercial litigation. Plaintiff maintains, however, that the Market Development Agreement specifically provides for David to recover his attorneys' fees. Paragraph 8(a) of the Agreement provides:

> Licensee [HPI] shall indemnify and save and hold Licensor [David] harmless from and against any and all liabilities, loss, costs, claims, causes of action, suits, damages and expenses, including reasonable attorney's fees and expenses, which Licensor becomes liable for, or may incur or be compelled to pay by reason of any acts, whether of omission or commission, that may be committed or suffered by Licensee or any of its servants, agents, contractors or employees, including, without limitation, those resulting from service rendered to customers or any injury to person or property in connection with the performance of this Agreement.

P.Exh. E, ¶ 8(a). Plaintiff asserts that "the defendants have asserted and abandoned an [sic] number of counterclaims and imposed costs on the plaintiff which, this Court, upon full briefing, could conclude was within the scope of the indemnity provisions." P.Mem. at 61–62.

■ Plaintiff's argument is too clever by half. The agreement's indemnity provision is clear on its face: it was meant to indemnify David from liabilities arising from injury or damage occurring in the course of the operation of the salon prototypes. Plaintiff cannot shoehorn its expenses from this litigation into an express provision clearly designed for other purposes.

Plaintiff also asks for damages representing the cost of setting up replacement prototypes for those the defendant never opened. David himself has opened several salons already, but, as defendants pointedly note, those salons are in Manhattan even though, under the Market Development Agreement, defendants were not supposed to set up additional salons in New York. Defendants also argue that David opened all but one of these salons after August 1988, when the Market Development Agreement would have expired, so that only one salon—if any—should be considered a replacement salon. However, having breached the contract, defendants are hardly in a position to criticize plaintiff for attempting to mitigate his damages by any means available to him. Moreover, as noted below, the agreement might well have been extended until August 1992. Whether the recently opened salons are actually "replacements" for those contemplated by the agreement is something best left to a jury.

In addition, defendants maintain that the "replacement" salons would actually be more valuable than the salons HPI was to have established; that David is entitled only to his net cost; and that this claim is duplicative of David's $8.5 million lost profits claim. Given today's ruling, the last point is no longer at issue. As for defendants' other arguments, they turn on questions of fact properly left to a jury.

Finally, plaintiff asks for the amounts which the defendants were to pay for advertising under the Market Development Agreement. *See* P.Exh. E, ¶ 4(d). In response, defendants argue not just that David was only entitled to this money once he had spent it on advertising, but also that he was not entitled to the reimbursement

for the two additional two year terms, since the agreement might not have been renewed. *See* P. Exh. E, ¶ 3(b).

■ If the agreement would have been renewed, plaintiff would have been entitled to additional reimbursement for advertising. Defendants maintain that, "HPI had no obligation to renew." D.Mem. Cause at 55. Still, renewal may be common under such agreements, and if so, the question of whether or not such a renewal was likely in this case is a question for the jury. In *Koufakis v. Carvel*, a case involving a terminated franchise agreement, the Second Circuit explained that,

> we agree that Koufakis had no contractual right to a renewal term. However, the agreement says nothing to exclude the possibility of a subsequent decision by the parties to renew for another term. In calculating damages, the jury was entitled to consider this possibility once they had determined that Franchise Licensors' termination of the contract was improper. Of course, the question is purely one of fact, and should be submitted to the jury only if there was evidence in the record that renewal was reasonably likely under all the circumstances.... There is considerable force to [the] argument that a franchisor and those who assume the role of dealer do not intend the time clause of the agreement as a rigid outer limit to the duration of their relationship.

425 F.2d 892, 908–909 (2d Cir.1970). Summary judgment on this issue is inappropriate.

### IV. Conclusion

For the reasons set forth above, the Court grants defendants' motion for summary judgment on the issues of causation and damages with respect to the lost profits from planned franchise salons and with respect to plaintiff's claim for attorneys' fees in this action. The Court denies defendant Glemby's motion for summary judgment on the issue of piercing the corporate veil and denies defendants' motion as to plaintiff's additional damage claims. At trial, plaintiff will be allowed to prove damages including the cost of setting up replacement salons, amounts due under the Know–How Agreement, the lost royalty income that would have been provided by the salons the defendants promised to open, and amounts which plaintiff asserts defendants were obligated to provide for advertising under the Market Development Agreement.

SO ORDERED.