[693 NYS2d 110]

Midori Shimamoto et al., Respondents, v S&F Warehouses, Inc., et al., Appellants, and Simon Meyrowitz Meyrowitz & Schlussel et al., Respondents, et al., Defendants.

First Department, June 22, 1999

**APPEARANCES OF COUNSEL**

*William J. Apuzzo* for Midori Shimamoto and others, plaintiffs-respondents.

*Stuart Halper* of counsel (*Stuart Halper & Associates,* attorneys), for S&F Warehouses and another, appellants.

*Jeffrey Hollander* for Friedman & Fishof, appellant.

*Thomas F. Cohen* of counsel (*Simon Meyrowitz & Meyrowitz, L. L. P.,* attorneys), for defendants-respondents.

## OPINION OF THE COURT

WALLACH, J.

This is an action for conversion arising from allegedly illegal enforcement of a warehouseman's lien, asserting breach of article 7 of the Uniform Commercial Code. The appeal presents a novel issue regarding the interpretation of UCC 7-210 that has apparently never produced a reported decision in this State, and rarely elsewhere, for that matter.

In 1980 and 1981, plaintiff's decedent imported a quantity of "ultra cashmere" fabric[1] from Italy, described as a "viscous rayon" with a suede-like nap, for use in his clothing manufacturing business. The fabric was initially stored in a Customs-bonded warehouse in Brooklyn, pending payment of import duties. When a dispute arose with the warehouseman as to the alleged loss of some of these goods, the fabric was transferred in 1986, at the behest of United States Customs agents, to the bonded section of defendant S&F Warehouses at the Brooklyn Navy Yard, where it remained until its disposal in 1991. (The physical transfer was carried out by defendant S&J Trucking Co.) Plaintiff's decedent agreed to pay the storage charges for these 358 cartons, at $640.80 per month, but he shortly became delinquent in these payments. By June 1991, when the arrears had exceeded $42,000, defendant Fishof, a vice president of S&F, referred collection of the debt to defendant Simon Meyrowitz Meyrowitz & Schlussel (the law firm) for collection. The law firm hired defendant FES Auctions to conduct a lien sale. Defendant Seipp, principal of FES, forwarded a draft notice of sale to attorney Schlussel, who would later testify at trial that he did not review the notice for compliance with the Uniform Commercial Code because he was under the impression that the Code only covered the sale of goods, and had nothing to do with auctions.

Unlike the sale of noncommercial goods (UCC 7-210 [2]), there are few specific requirements regarding the advertising of a public sale to enforce a lien on warehoused commercial

---

1. The complaint alleged 88,750 yards. Testimony at trial estimated the amount at between 60,000 and 70,000 yards.

goods. UCC 7-210 (1) requires only that the sale be conducted in a "commercially reasonable" manner, after all interested parties are notified of the nature, time and place of the sale, the amount due, and their right to challenge in a special proceeding the validity of the lien or the amount claimed. A warehouseman who fails to comply with these requirements for sale becomes liable for damages, "and in case of willful violation is liable for conversion" (UCC 7-210 [9]).

Even though the auction advertisement placed by FES in two issues of The American Banker, a paper of limited circulation, fell short of complete notice (e.g., it failed to mention the address or telephone number of the law firm where the auction was to take place), such publication was not required by the statute for the sale of commercial goods. The required formal notice mailed to the last known address of plaintiff's decedent was more specific, identifying the date and place, the value attributed to the goods ($25,000), and the amount of the lien ($42,847.81). But even that notice failed to include the statutorily required notification of the claimant's entitlement to challenge the validity of the lien or the amount claimed. The notice was thus defective in this respect.

The auction was held at the law firm's office on the morning of September 24, 1991. Even attorney Schlussel was not present, because this was a religious holiday. When no bidders appeared, the auctioneer exercised S&F's statutory option (UCC 7-210 [4]), on instructions from Schlussel, and entered a winning bid of $25,000. Title to the goods passed thereupon to S&F. Plaintiff's decedent appeared at the law firm's office a few days later to inquire about his goods, and was informed that they had been sold.

This action for conversion seeks compensatory damages of $2,174,375, the alleged value of the fabric. Determination of damages was left to the jury.

■ On the eve of trial, an application by the warehouse and trucking defendants to cross-claim against the law firm was denied. Plaintiffs then agreed to dismissal of the complaint against the auctioneer and his company, and against the individual partners of the law firm. At the conclusion of trial, the balance of the case on liability was taken away from the jury. After directing a verdict in favor of the law firm, the trial court made findings that the recently absolved auctioneer had in fact been negligent in noticing the auction, and that the law firm had also been negligent in failing to oversee and correct the auctioneer's errors. The negligence of these two agents was

now imputed solely to the warehouseman and its trucking carrier, and a verdict on the issue of liability was directed against those defendants and their principals. This was error.

The UCC standard for enforcement of a warehouseman's lien on merchandise is that the sale must be "commercially reasonable" (UCC 7-210 [1]). If anything, the remaining defendants adopted the prudent course of consulting an attorney, who in turn procured a licensed auctioneer. These defendants had every right to assume that once the case was placed in the hands of the law firm and its designated auctioneer, those latter entities would exercise their expertise in bringing about a valid foreclosure of the warehouseman's lien. To dismiss the case against the erring parties and leave the diligent client fully liable as a matter of law is a result that is not only unsupported in the record, but is repugnant to common sense.

In dismissing the case against the law firm, the trial court found that the firm had been negligent, but that "something more than negligence [was] required" to hold it liable.[2] On the other hand, the remaining defendants were found to have willfully violated the statute with regard to the notice and conduct of the auction, and thus were held liable for conversion (UCC 7-210 [9]).

In so ruling, the trial court erroneously relied upon a Pennsylvania Bankruptcy Court decision (*Grant v Superior Moving & Stor.*, 182 Bankr 709, *affd* 1995 US Dist LEXIS 13867 [ED Pa, Sept. 18, 1995, Weiner, J.]). That case is inapposite. The standard applied in *Grant* was section 7210 (b) of Pennsylvania's Warehouseman's Act (13 Pa Cons Stat Annot § 7210 [b]), which is equivalent to New York's UCC 7-210 (2), the provision that treats enforcement of a warehouseman's lien on storage "other than goods stored by a merchant in the course of his business". In *Grant*, the goods in question were the personal property of a residential evictee, whereas our case is governed by the more general procedures outlined in UCC 7-210 (1), involving the foreclosure of a lien on warehoused merchandise. Furthermore, the trial court relied upon mere dictum, for the *Grant* court had found that the warehouseman had committed no "willful violation" of the statute, and thus was not liable for conversion.

The trial court's emphasis on meticulous compliance with UCC 7-210 is undermined by the very structure of the statute.

---

2. The law firm continues to represent itself and one of its individually named partners even on this appeal.

For example, the trial court focused on certain purported "illegalities" in the notice and conduct of the auction, viz.,

- the "auction was not held in a place reasonably near where the property was stored". This is a requirement found in UCC 7-210 (2) (e), and has no equivalent in section 7-210 (1).

- the auction "was not advertised in a kind of newspaper which was likely to attract the textile trade". UCC 7-210 (2) (f) calls for advertisement in a newspaper of general circulation; section 7-210 (1) is, again, silent on the method of advertisement.

- the advertisement "did not list a telephone number or provide for inspection of the goods at the place where the auction was to be held". Neither subdivision of the statute imposes such requirements.

- the advertisement failed to "describe" the goods. This is a requirement in UCC 7-210 (2) (f), but, again, is nowhere to be found in section 7-210 (1).

In getting sidetracked on these irrelevancies, the trial court made no mention of the failure of the auction notice to include the statutorily required declaration that anyone claiming an interest in the goods was entitled to bring a special proceeding to challenge the validity or amount of the lien.[3] But even that oversight does not necessarily constitute a "willful violation" of the statute, rendering the warehouseman liable for conversion, especially in light of the fact that the notice was drawn by his professionally expert agents—his auctioneer and his attorney, neither of whom the trial court saw fit to stand before the trier of facts on the question of their own negligence.

There is a dearth of cases construing the standard for "willful violation" under UCC 7-210 (9), but even the Pennsylvania Bankruptcy Court recognized that it would require a grossly reckless disregard for legal obligations, manifested by conscious noncompliance with, or deliberate unwillingness to discover and obey, the law (*Grant v Superior Moving & Stor.*, *supra*, 182 Bankr, at 718). Whatever carelessness was evident in the drafting of the notice fell far short of a willful violation of the statute (*see*, *Long's Transfer & Stor. v Busby*, 358 So 2d 393 [Miss]; *Scott v Hurd-Corrigan Moving & Stor. Co.*, 103

---

3. This is a provision unique to New York's version of the UCC (*see*, 2C ULA 164 [1991]). Indeed, New York alone adds UCC 7-211, outlining the procedure for challenging the validity of a warehouseman's lien.

Mich App 322, 302 NW2d 867; *cf.*, *Bradford v Muinzer*, 498 F
Supp 1384, 1390-1391 [ND Ill]). In any event, willfulness pre-
sents a question of fact for the jury, so directing a verdict in
plaintiffs' favor on this issue was error as a matter of law
(*Miller v Henshaw*, 808 P2d 715 [Okla App]).

■ The disposition against defendants Friedman and Fishof
was erroneous for another reason. Hard upon the trial court's
indication that there were triable issues of fact on the liability
of these corporate officers, it inconsistently granted plaintiffs'
motion for a directed verdict against them. But there was no
basis for submitting the question of their individual liability to
the jury in the first place. The pleadings contain no separate
allegations against them. As officers, they are protected by a
corporate veil, and no effort was made to pierce that veil.
Indeed, this record contains no evidence to indicate that these
individual defendants used their positions for personal rather
than corporate ends (*Port Chester Elec. Constr. Corp. v Atlas*,
40 NY2d 652). No showing was made that they independently
committed any tortious acts that would render them personally
liable (*Konrad v 136 E. 64th St. Corp.*, 246 AD2d 324, 326), or
that they personally participated in the alleged conversion
(*Ingram v Machel & Jr. Auto Repair*, 148 AD2d 324, 325, *ap-
peal dismissed* 74 NY2d 792). Their own motion for a directed
verdict at the close of evidence should have been granted.

The case should be remanded for a new trial. The complaint
should be dismissed as against the principals of the warehouse
and trucking corporations, and reinstated against the defen-
dant law firm. Inasmuch as UCC 7-210 (1) gives little specific
guidance in noticing and conducting an auction, the issue of
reasonableness becomes one of fact, where expert professional
witnesses might shed light on relevant matters such as the
custom and usage in the trade. The ultimate question of fact to
be determined on liability by a new jury should be whether the
sale of goods was effected in a "commercially reasonable" man-
ner.

■ On the issue of damages, it is problematic how valuable
the goods could have been, considering the fact that they were
left with Customs for so long. The fabric had initially been
purchased at $4.70 per yard, fully 18 years before the trial.
Expert testimony was heard at trial as to its current value.
Strictly speaking, the pertinent valuation date would be the
date of the alleged conversion, i.e., the auction sale.

The owner's own former production manager testified that
the market price of this fabric was at least $20 per yard, and

that such value persisted through 1991, even after sitting in storage in Customs and with defendant warehouse for 10 years. Of course, that evaluation rested on a dubious foundation because not a single yard of the fabric was sold during that period.

A second, nonemployee expert witness called by plaintiffs—a professor in the Textile Development and Marketing Department at the Fashion Institute of Technology—testified that by 1991, the fabric had a cost value of about $14 per yard, and a market value of about $24 per yard. The professor conceded on cross-examination, however, that his estimate of market value in 1991 was not based on any empirical evidence, inasmuch as the plaintiff company was then the only source of such fabric in the United States, and he was unaware of any sales of such fabric during the 10-year period.

Also testifying for plaintiffs was a retired Judge who had served as a special master in the 1986 Federal suit plaintiff's decedent had brought against the first warehouse. His evaluation *at that time*, based upon *1981* sales, estimated the fair market value at $25 per yard.

Appearing for the warehouse and trucking defendants were two experts with a combined history of nearly 60 years' experience in the garment industry. One testified that ultra cashmere—which he had never heard of before this trial—was not a popular fabric in the 1980's, and was definitely out of style by the time of trial. Furthermore, he felt that no apparel manufacturer would buy 10 year old fabric. In light of growing competition in similar material from the Orient at the time, he estimated the value of this Italian-made fabric in 1991 at no more than $2 per yard.

Defendants' second witness examined 13 different rolls of this fabric, or about 1% of the total. He testified that he found only one of those rolls to be "first quality." Two rolls he categorized as C-grade "second quality," which would have to be sold at 10 to 25% off fair market value. The remainder he called second quality "as are" fabric, which was of no value to a manufacturer of apparel. Even "first quality" fabric sold at less than $3.50 per yard in 1991, and "as-are" goods would be worth no more than 50 to 75¢ per *pound,* usable only for dolls' clothing and the like.

In reaching a net verdict of $394,549.74 (which included damages for conversion, less a setoff on the warehouse defendant's counterclaim for storage), the jury evidently used the purchase price as its measure of value, a standard that

was never espoused by any of the expert witnesses. Since this evaluation has no evidentiary support, the verdict must be vacated and damages also reconsidered upon retrial.

Accordingly, the judgment of Supreme Court, New York County (Louise Gruner Gans, J.), entered March 27, 1998, which, after jury trial and a directed verdict, awarded plaintiffs $394,549.74 in net damages for conversion, should be reversed, on the law, without costs, the verdict directed against the warehouse and trucking defendants should be vacated, the cause of action for conversion should be dismissed, the verdict directed in favor of the law firm should be vacated and that party reinstated as a defendant, the complaint should be dismissed in it's entirety as against the individual officers of the warehouse and trucking defendants, and the case remanded for a new trial on all remaining issues, without prejudice to assertion of a cross claim for indemnification by the corporate defendants against the law firm. The Clerk is directed to enter judgment in favor of the individual defendants-appellants Eugene Friedman and Avi Fishof dismissing the complaint as against them.

Motion seeking to strike reply brief denied as academic.

NARDELLI, J. P., LERNER, ANDRIAS and BUCKLEY, JJ., concur.

Judgment, Supreme Court, New York County, entered March 27, 1998, reversed, on the law, without costs, the verdict directed against the warehouse and trucking defendants vacated, the cause of action for conversion dismissed, the verdict directed in favor of the law firm vacated and that party reinstated as a defendant, the complaint dismissed in its entirety as against the individual officers of the warehouse and trucking defendants, and the case remanded for a new trial on all remaining issues, without prejudice to assertion of a cross claim for indemnification by the corporate defendants against the law firm. Motion seeking to strike reply brief denied as academic. [As amended by unpublished order entered Feb. 18, 2000.]