Americore Drilling & Cutting, Inc., Plaintiff,

against
EMB Contracting Corp., and CHILLED PROPERTIES, LLC., Defendants.


3276/13

For plaintiff
Josh Obernan, Esq.
Goetz Fitzpatrick, LLP
For Defendant
Scott Goldberg, Esq.
Goldberg & Bokor, LLP


Timothy J. Dufficy, J.

DECISION AFTER TRIAL
A trial was held before this Court, on October 22, 2016, November 15, 2016, November 16, 2016, November 17, 2016, and November 18, 2016. As this was a bench trial, the Court was both the finder of facts and the determiner of questions of law. The Court considered the testimony of the witnesses, gave weight to that testimony, and generally determined the reliability of the witnesses' testimony (See Horsford v Bacott, 32 AD3d 310, 312 [1st Dept. 2006]). The Court also considered the interest or lack of interest in the case and the bias or prejudice of the witnesses (See People v Ferguson, 178 AD2d 149 [1st Dept. 1991). The Court declined to apply the maxim of falsus in uno, falsus in omnibus. Accordingly, the Court made credibility determinations on a case-by-case basis, wherever necessary and appropriate to do so (see Noryb Ventures, Inc. v Mankovsky, 47 Misc 3d 1220(A), 1220A [Sup. Ct. NY Co. 2015]). Having reviewed the parties' submissions and having reflected upon the evidence submitted at trial, the Court renders the following Findings of Fact and Conclusions of Law. 
FINDINGS OF FACT
Plaintiff Americore Drilling & Cutting, Inc (AMC) was initially hired by [*2]defendant EMB Contracting Corp. (EMB) to perform interior concrete cutting work at a hotel, located at 38-28 27th St., Long Island City, Queens County. The property was owned by an entity known as Chilled Properties LLC (Chilled). Because AMC was already on site, EMB later asked AMC to perform concrete cutting on the exterior balconies of the hotel. AMC never signed a contract with EMB for either the interior cutting or balcony work. Both jobs were performed pursuant to separate oral agreements between the parties. There was testimony that due to the exigencies of construction projects, it is sometimes the custom and practice that contracts are not signed.
The parties agreed orally that the plaintiff would perform the interior cutting work pursuant to linear foot pricing. This entails adding together the amount of linear feet on each side of the opening. The plaintiff's price was determined by multiplying the number of linear feet by a dollar amount. The dollar amount was determined by the difficulty of accessing the project, the availability of water which is necessary to operate the cutting tools, whether the pieces of cut concrete can be dropped to the floor or have to be hoisted to the side, how quickly the openings can be cut, the depth of the concrete, and how much rebar is contained in the concrete. Concrete with greater amounts of rebar are more difficult and time-consuming to cut. Based on the plaintiff's experience in the cutting industry, the testimony was that linear foot pricing is a standard for routine interior cuts that were performed at the hotel. Interior cuts are easier to perform. Large machinery can be used, and the work can be completed by one man. In August 2012, while the plaintiff was performing the interior cutting work, EMB's principal asked the plaintiff to expand the scope of its work to include cutting the outdoor balconies to shorten them. EMB requested a price, but AMC could not furnish a quote because the price was dependent upon how long it would take to cut the balconies. AMC advised EMB that the only way they could price the job was at a daily rate, which would be $1,100 per crew per day. The pricing was established by oral agreement between the parties. The balcony work was significantly more complex, dangerous and time-consuming than the interior work. Due to the difficulty of the work it could take two to three days to finish one balcony. Multiple safety precautions were necessary to protect AMC's men, the building and the public from the work. The concrete pieces had to be attached to a come-along to prevent them from falling. AMC's equipment had to be secured in the same manner, to keep it from falling. The men and equipment had to be tethered. These safety procedures were required by the New York City Department of Buildings. In addition, the machines used to cut the balconies were smaller and slower, thereby reducing the amount of work that could be performed in a given day.
EMB's superintendent, Stephen Fray, monitored the day-to-day operations at the site, signing work orders that acknowledged that two crews were working. Mr. Fray stated that the balcony work orders did not contain anything about linear feet. AMC's expert testified that the prices charged were within industry standards.
It took AMC one hundred seventeen (117) days to cut sixty (60) balconies. [*3]Invoices were sent to EMB. The billing procedure was that AMC's invoices were received through mail or email by Stavroula Koutsilianos, EMB's secretary, who would enter them in QuickBooks. Then either her manager, Vicky Sterigous, the principals Michael Batalias or Elisavet Batalias would direct Stavroula Koutsilianos to pay them. EMB paid twelve (12) of the invoices for balcony work charged at the daily rate.
On December 3, 2012, after AMC finished every cut at the hotel, it requested the $118,000 balance that it was owed. There was a meeting with EMB's bookkeeper Vicky Sterigous. AMC was offered $80,000 by EMB. EMB claimed that it was in financial distress, and attempted to obtain a discount. The Court credits the testimony of Daniel B. Reddan, P.E., an expert in the field construction management and construction claims, that the plaintiff's billing practice comported with industry standards, and that the amounts billed were appropriate in the industry. The Court discounts the testimony of defendant's witness Mr. Paonessa, AMCs former superintendent, because the individual was fired by AMC, allegedly violated a non-compete agreement, and therefore harbors extreme bias and animosity against AMC. In sum, EMB did not object to AMC's invoices until after the work was completed, and it was apparently having difficulty making payment.
With respect to the corporate structure of the two co-defendants, the Court finds as follows. Michael Batalias created EMB in 1996. His daughter, Ms. Elisavet Batalias, was the sole owner of EMB, from 1998 or 1999 until 2010.
On or around 1998, Michael Batalias placed the entity in Ms. Batalias's name when she was 22 years old, still in college, and had no experience in construction. In so doing, the company became certified as a woman-owned business enterprise, even though Michael Batalias actually controlled the company. It later lost its status as a woman-owned business enterprise, because it exceeded $3 million dollars in earnings. In 2010, EMB was debarred by the School Construction Authority. Ms. Batalias was arrested and indicted as a result of this debarment, along with her father and Ms. Sterigous, their employee. The three were charged with Grand Larceny in the 1st degree and Scheme to Defraud in the 1st degree. Elisavet Batalias was charged with eleven (11) counts of Offering a False Instrument for Filing in the 1st degree. Michael Batalias pled guilty, paid $1,100,000 in restitution, EMB was barred, and the charges against his daughter were dropped. Under the terms of the plea bargain, EMB would be debarred, and the charges against his co-conspirators would be dropped, even though Ms. Batalias owned the company. In 2010, Ms. Batalias transferred EMB to her father without consideration. However, the documentary evidence indicated that she still continued to work there, until 2015, and approved certain invoices on EMB's behalf. She testified that she worked at EMB because she owns part of Chilled, and was interested in the project, since EMB was the general contractor. Ms. Batalias testified that Chilled really does not do much work, because the hotel is run by a management company owned by Ms. Batalias and her siblings. 
While Ms. Batalias owned EMB, that entity performed $4,500,000 worth of concrete work on two parcels of land in Long Island City, one of which was owned by Michael Batalias and his wife, one of which was owned by Ms. Batalias and her siblings. She stated that, because her family could not pay EMB for the work, they signed over the parcel of land directly to her as payment for the work EMB performed. After she received the land to pay off EMB's debt, she created a new corporation, with her siblings, called Chilled Properties, to which Ms. Batalias, without consideration, transferred the property which she had purportedly taken as payment for EMB's work. She then gave her ownership in EMB to her father without consideration and hired EMB to build the hotel. These were obviously not arms-length transactions. After being debarred from the School Construction Authority, EMB never performed any work for anyone except for Chilled Properties. Stella and Vicki, former EMB employees, now work for the hotel's management group and Chilled, respectively. Thus there is a commonality of management and control. Ms. Batalias now owns ten percent (10% ) of Chilled Properties Limited, which now owns the hotel where the work was performed. Her four siblings own the remaining shares. Mr. Batalias owns EMB, a company that is apparently judgment-proof. This is a convenient arrangement, since it means that the plaintiff, the party in privity with the general contractor EMB, will be unable to collect the money for the additional work it performed cutting the balconies, while the related company, Chilled Properties, retains the benefit of the plaintiff's work. The entities changed hands whenever convenient, in order to hamper the ability of creditors such as the plaintiff to collect payments due them for their work.
CONCLUSIONS OF LAW
Amendments
Pursuant to CPLR 3025(c), the Court shall permit the plaintiff to conform its pleadings to the evidence at trial, permitting AMC to assert a cause of action for an account stated. Leave to conform a pleading or the bill of particulars to the proof pursuant to CPLR 3025(c) should be freely granted absent prejudice or surprise resulting from the delay (Hine v Jafa Transp., Inc., 97 AD3d 794 [2d Dept. 2012]). Here, the Court will permit the plaintiff to add a cause of action for account stated, although, as will be discussed, infra, this cause of action is merely a permissive alternative theory of liability. EMB was well aware that the plaintiff claimed that it kept the plaintiff's invoices without objecting until after the work was completed and payment requested. Thus, there is neither prejudice or surprise. As for "alter ego" or "piercing the corporate veil," New York does not recognize a separate cause of action to pierce the corporate veil" (Fiber Consultants, Inc. v Fiber Optek Interconnect Corp., 15 AD3d 528, 529 [2d Dept 2005] lv dismissed 4 NY3d 882 [2005]; see also DiMauro v United, LLC, 122 AD3d 568 [ 2d Dept. 2014; Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141[1993]). Hence, it is not necessary to add said cause of action, as it would not be meritorious. The lack of a formal cause of action in no way precludes availability of the remedy.
Oral Agreements
With respect to the first cause of action, the elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance of the contract by the injured party; (3) breach by the other party; and (4) resulting damages (JP Morgan Chase v J.H. Elec. of NY, Inc., 69 AD3d 802 [2d Dept 2010]). The party seeking to enforce a contract bears the burden to establish that a binding agreement was made and to prove the terms of the contract (Paz v Singer Co., 151 AD2d 234, 235 [1st Dept. 1989], citing Fisch, NY Evidence § 1098 [2d ed]). The agreement is required to be sufficiently definite so that a court can ascertain its terms for the purpose of determining whether it has been breached and avoiding imposition of contractual obligation under circumstances where intent to conclude a binding agreement is not present (Cobble Hill Nursing Home v Henry & Warren Corp., 74 NY2d 475, 482 [1989], cert denied 498 US 816 [1990]; Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc., 206 AD2d 166, 169-170 [1st Dept. 1994]). To establish breach of a contract, plaintiff must show a contract, that he performed and defendants breached it, and that defendants' breach caused him to sustain damages (see Harris v. Seward Park Hous. Corp., 79 AD3d 425, 426 [1st Dept. 2010]).
Oral contracts that provide for contingencies which can be performed within one year are enforceable (see General Obligations Law § 5-701 [a] [1];D & N Boening, Inc. v Kirsch Beverages, Inc., 99 AD2d 522 [2nd Dept. 1984]; North Shore Bottling Co. v Schmidt & Sons, 22 NY2d 171 [1968]; Nazareth Nursery Parent Assn. v Nazareth Nursery, Inc., 2015 NY Misc LEXIS 1988, *9, 2015 NY Slip Op 30941(U), 4 [Sup Ct. NY Co. 2015]). Here, the plaintiff has proven that there was an oral agreement for the performance of interior cutting, as well as separate work cutting the balconies. The balcony cutting work was priced at a daily rate, and the work was capable of being performed, and was, in fact performed, within a year. The uncontroverted testimony was that it took one hundred seventeen (117) days to cut sixty (60) balconies. The Court credits the plaintiff's testimony that there was an oral agreement whereby the balcony cuts were extra work, that was to be performed by daily rate price due to their difficulty, as well as the additional time and safety concerns involved. The Court credits the plaintiff's explanations of the circumstances under which the work was requested, along with the fact that there was partial payment. The Court does not credit the defendants' explanation that the work was included in the original oral agreement between the parties. The Court finds both Mr. and Ms. Batalias's testimony evasive and untruthful in this area.
Unjust Enrichment
Even assuming that there was no agreement, the fact that there may not have been a written or oral contract between the parties in no way precludes the plaintiff's recovery [*4]in this matter.
"It is well settled that '[t]he essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered'" (Sperry v Crompton Corp., 8 NY3d 204, 215 [2d Dept. 2007] quoting Paramount Film Distrib. Corp. v State of New York, 30 NY2d 415, 421 [1972); see also Goldman v. Metropolitan Life Ins. Co., 5 NY3d 561, 572 [2005]). Further, "[t]o recover in quantum meruit, a plaintiff must establish that the services were performed for the defendant or at its behest" and "must also establish, inter alia, that it had 'an expectation of compensation therefor'" (Infusacare Medical Services, P.C. v Syracuse Home Assn., 49 AD3d 1176 [4th Dept. 2008] quoting Moors v Hall, 143 AD2d 336, 337 [2d Dept. 1988). "It is not enough that the defendant received a benefit from the activities of the plaintiff (Heller v Kurz, 228 AD2d 263, 264 [1st Dept. 1996]; see also Corporate Nat'l Realty v Lab. Corp. of Am., 2008 NY Misc LEXIS 4582, 15-16 Sup. Ct. Nassau Co. 2008] [ Bucaria, J., CD]). "In order to make out a cause of action in quantum meruit or quasi contract, a plaintiff must establish (1) the performance of services in good faith; (2) the acceptance of those services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services" (Landcom, Inc. v Galen-Lyons Joint Landfill Commn., 259 AD2d 967, 968 [2d Dept. 1999]; see Heller v Kurz, 228 AD2d 263, 264 [2d Dept. 1996]). Here, the plaintiff has, prima facie, established all of the foregoing elements, and is entitled to payment. To establish a quantum meruit claim, the plaintiff must show that it performed services in good faith, which defendants accepted, and for which he reasonably expected to be compensated, and the services' reasonable value (see Fulbright & Jaworski, LLP v Carucci, 63 AD3d 487, 489 [1st Dept. 2009]). These elements were established. 
Hence, plaintiff may recover based on quantum meruit, if the contract for its services is unenforceable (see Ellis v Abbey & Ellis, 294 AD2d 168, 170 [1st Dept. 2002]). Plaintiff permissibly pleads its quantum meruit claim alternatively to its breach of contract claim, given the dispute over the validity and terms of the oral agreement (see Veritas Capital Mgt., L.L.C. v Campbell, 82 AD3d 529, 530 [1st Dept. 2011]). Here, EMB did not dispute that AMC performed the concrete cutting work in good faith without objection until payment was requested, or that the work was of acceptable quality. EMB did nothing to dispute the scope or quality of the work until it was completed, and payment was to be made. It was only at that point, when plaintiff's principal called to inquire about payment, that EMB began to throw up impediments to payment, and dispute the cost of the work. Hence, if AMC was not already entitled to relief under a breach of contract theory, it would nonetheless be entitled to recover under quantum meruit (see Balestriere PLLC v Banxcorp, 96 AD3d 497, 498 [1st Dept. 2012]).
Account Stated
The Court has permitted the plaintiff to amend its pleadings to assert a cause of [*5]action for account stated in the alternative since that cause of action is meritorious and causes no surprise or prejudice to the defendants. If AMC was not entitled to relief under a breach of contract theory, it would nonetheless be entitled to recover under the cause of action for account stated.
'A cause of action for an account stated has been described as 'an alternative theory of liability to recover the same damages allegedly sustained as a result of the breach of contract'" (Episcopal Health Servs., Inc. v POM Recoveries, Inc., 138 AD3d 917, 919 [2d Dept. 2016] citing Citibank (South Dakota) N.A. v Cutler, 112 AD3d 573 [2d Dept. 2013]; see also Montilli Plumbing & Heating Corp. v Valentino, 90 AD3d 961[2d Dept. 2011]). "An essential element of an account stated is that the parties came to an agreement with respect to the amount due. '[W]hile the mere silence and failure to object to an account stated cannot be construed as an agreement to the correctness of the account, the factual situation attending the particular transactions may be such that, in the absence of an objection made within a reasonable time, an implied account stated may be found'" (Episcopal Health Servs., Inc. v POM Recoveries, Inc., supra ). "An account stated represents an agreement between the parties reflecting an amount due on a prior transaction" (Cameron Eng'g & Assoc., LLP v JMS Architect & Planner, P.C., 75 AD3d 488, 489 [2d Dept 2010]).
The key element of a prima facie account stated claim is transmission of an invoice to defendants, forming the predicate for defendants' failure to object to the invoice within a reasonable time (see RPI Professional Alternatives, Inc. v. Citigroup Global Mkts. Inc., 61 AD3d 618, 619 [1st Dept. 2009]). Failure to object constitutes an assent to pay the invoice (see Morrison Cohen Singer & Weinstein, LLP v. Brophy, 19 AD3d 161, 162 [1st Dept. 2005]).
By issuing invoices, AMC established an expectation that it would be paid for its services, and the invoices established the reasonable value of those services (see Paul F. Vitale, Inc. v Parker's Grille, Inc., 23 AD3d 1147 [4th Dept. 2005] lv denied 6 NY3d 707 [2006]; United Bldg. Maintenance Assoc., Inc. v 510 Fifth Ave. LLC, 18 AD3d 333 [2d Dept. 2005]; Evans-Freke v Showcase Contr. Corp., 85 AD3d 961 [2d Dept. 2011]; Johnson v Robertson, 131 AD3d 670 [2d Dept. 2015]; Capital Heat, Inc. v Buchheit, 46 AD3d 1419, 1420-1421 [4th Dept. 2007]). Plaintiff's evidence establishes, prima facie, that EMC retained AMC's billing statements for an unreasonable period of time without objecting to them (see American Express Centurion Bank v Cutler, 81 AD3d 761, 762 [2d Dept 2011]; Raytone Plumbing Specialities, Inc. v Sano Constr. Corp., 92 AD3d 855, 856 [2d Dept 2012]) until such time as payment was requested. Partial payment of invoices constitutes an acknowledgment of the validity of the debt, and establishes an account stated cause of action ( see e.g. Pianko v Goetz Fitzpatrick LLP, 2016 NY Misc LEXIS 2859, *24, 2016 NY Slip Op 31468(U), 14 [Sup. Ct. NY Co. 2016]). EMB paid twelve (12) of the invoices, until it experienced cash-flow problems, then offered the [*6]plaintiff the sum of $80,000 to resolve this matter. Hence, the plaintiff established an account stated, in the sum of $118,000, for the services which it performed.
Piercing the Corporate Veil
Veil-piercing is a narrowly construed doctrine limiting "the accepted principles that a corporation exists independently of its owners . . . and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners" (Matter of Morris v New York State Dept. of Taxation & Fin.,  supra at 140; see Vivir of L I, Inc. v Ehrenkranz, 145 AD3d 834 [2d Dept. 2016]). The party seeking to pierce the corporate veil bears the heavy burden of "showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (id. at 141; Sheridan Broadcasting Corp. v Small, 19 AD3d 331, 332 [1st Dept 2005]). Piercing the corporate veil is an equitable concept that allows a claimant or creditor to disregard a corporation and to hold its controlling shareholders personally liable for corporate debts or other liabilities. "Additionally, the corporate veil will be pierced to achieve equity, even absent fraud, when a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego" (Williams v Lovell Safety Mgt. Co., LLC, 71 AD3d 671, 672 [2d Dept. 2010][internal quotation marks omitted]; see DeMartino v 3858, Inc., 114 AD3d 634, 636, 979 NYS2d 648; Campone v Pisciotta Servs., Inc., 87 AD3d 1104, 1105 [2d Dept. 2011]). 
The concept of piercing the corporate veil is an exception to the general rule that a corporation exists independently of its owners who are not personally liable for its obligations, and that individuals may incorporate for the express purpose of limiting their liability (see generally Bartle v Home Owners Coop., 309 NY 103, 106 [1955]). The successful invocation of the doctrine of piercing the corporate veil permits, in certain circumstances, the imposition of personal liability on owners for the obligations of their corporation (see Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 140-141 [1993]).
A plaintiff seeking to pierce the corporate veil must demonstrate that a court should intervene because the owners of the corporation exercised complete domination over it in the transaction at issue.Indicia of a situation warranting veil-piercing include: " '(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed [*7]by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated  corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own' ". (Peery v United Capital Corp., 84 AD3d 1201, [2d Dept. 2011] quoting Gateway I Group, Inc. v Park Ave. Physicians, P.C., 62 AD3d at 146 [2d Dept. 2009] quoting Shisgal v Brown, 21 AD3d 845, 848-849 [2d Dept. 2005]).
With regard to imposing alter ego liability, the corporate veil will be pierced to achieve equity, even in the absence of fraud, where a "corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego" (Austin Powder Co. v McCullough, 216 AD2d 825, 827 [3d Dept. 1995]). Thus, where a corporation is a mere fragment of a larger corporate entity "which actually conducts the business, the larger corporate entity may be held financially responsible for the acts of that corporation" (Billy v Consolidated Mach. Tool Corp., 51 NY2d [1980]).
In order to state a claim for alter-ego liability plaintiff is generally required to allege "complete domination of the corporation [here EMB] in respect to the transaction attacked" and "that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (Baby Phat Holding Co., LLC v Kellwood Co., 123 AD3d 405, 407 [1st Dept. 2014] citing Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141[1993]). When determining whether the owners abused the corporate form, the following factors are considered: "a failure to adhere to corporate formalities, inadequate capitalization, use of corporate funds for personal purpose, overlap in ownership and directorship, or common use of office space and equipment" (E.D. & F. Man Sugar Inc. v ZZY Distrib., Inc., 2016 NY Misc LEXIS 2437, *13-14 [Sup Ct. NY Co,. 2016]) citing Forum Ins. Co. v Texarkoma Transp. Co., 229 AD2d 341, 342 [1st Dept 1996]; see also Webmediabrands, Inc. v Latinvision, Inc., 46 Misc 3d 929 [Sup Ct. NY Co. 2014]). "The determinative factor is whether the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends" (Port Chester Elec. Constr. Corp. v Atlas, 40 NY2d 652, 657 [1976]). Because a decision to pierce the corporate veil in any given instance will necessarily depend on the attendant facts and equities, there are no definitive rules governing the varying circumstances when this power may be exercised (id.).
A bare claim that the corporation was "completely dominated by the owners, or conclusory assertions that the corporation acted as their alter ego," will not give rise to piercing the corporate veil (see e.g., Goldman v Chapman, 44 AD3d 938, 939, 844 NYS.2d 126 [2d Dept. 2007]). In other words, domination, standing alone, is insufficient; there must also be some proof of wrongdoing or injustice done to the [*8]plaintiff. The very heavy burden of establishing complete domination and that such domination resulted in a wrong against the plaintiff is on those seeking to pierce the corporate veil (see TNS Holdings, 92 NY2d at 339).
A claimant can prevail without proving fraud "if the claimant can identify some non-fraudulent 'wrong' attributable to the defendant's complete domination of a subsidiary entity." (Trustees of the NY City Dist. Council of Carpenters Pension Fund v Centurion Cos., Inc., 2016 NY Misc LEXIS 2507, *6 [Sup Ct. NY Co.2016] citing Rolls-Royce Motor Cars, Inc. v Schudroff, 929 F. Supp. 117, 122 [S.D.NY 1996]; see also Baby Phat Holding, supra at 407 ("While fraud certainly satisfies the wrongdoing requirement, other claims of inequity or malfeasance will also suffice.").
As a general rule, a court will pierce the corporate veil or disregard the corporate form whenever necessary to prevent fraud or to achieve equity (see Hyland Meat Co. v Tsagarakis, 202 AD2d 552 [2d Dept. 1994]).
Allegations that "corporate funds were purposefully diverted to make it judgment-proof' or that "a corporation was dissolved without making appropriate reserves for contingent liabilities" satisfy the pleading requirement of wrongdoing (see Trustees of the NY City Dist. Council of Carpenters Pension Fund v Centurion Cos., Inc., 2016 NY Misc LEXIS 2507, *8 [Sup. Ct. NY Co. 2016]; Baby Phat Holding, supra at 407-8 , citing Grammas v. Lockwood Assoc., LLC, 95 AD3d 1073, 944 NYS.2d 623 [2d Dept. 2012]; WebMD, LLC v Media Banner Ad Sales Inc., 2016 NY Misc LEXIS 2974 [Sup Ct NY Co. 2016]).
In Webmediabrands, Inc. v Latinvision, Inc., supra, the Court found that the evidence on the record of commingling of funds, and evidence of overlapping owners and directors who controlled both companies strongly supported plaintiffs' veil piercing claim that one company was the alter ego of the other. In Pae v Chul Yoon, 41 AD3d 681, 682 [2d Dept. 2007], the defendant was the sole owner of the corporation, dominated the corporation and was solely responsible for the wrongful failure of the corporation to pay the plaintiff. The evidence also revealed the absence of corporate formalities, such as the lack of a distinction between corporate funds and the defendant's personal funds. The Court in Hyland Meat Co. v Tsagarakis, supra at 553 held that:
Upon review of the record, we find that the evidence established that the partners of MLM Associates (hereinafter the MLM partners), who were the same individuals as the shareholders of Willoughby's Restaurant, Inc., had control over the daily operations involved in running the restaurant, and used their control of the restaurant to induce the plaintiff to continue making deliveries of meat for which it was not paid.
In a case very analogous to that at bar, Gateway I Group v Park Ave. Physicians, in which the defendant corporations had an overlap and interlock of owners, officers, and directors, and one corporation, while insolvent and for no consideration, conveyed its assets and accounts receivables to the other so that it would be judgment proof, the [*9]Second Department found that one corporation was the alter ego of the other (see Gateway I Group v Park Ave. Physicians, P.C., 62 AD3d 141, 146-147 [2d Dept. 2009]). Here, EMB performed $4,500,000 of concrete work on land Elisavet Batalias partially owned, for which EMB received no payment. Next, Elisavet Batalias's family and herself transferred the land, supposedly constituting payment to her personally, and then to a newly formed entity, while she was still working with EMB. She then transferred the judgment-proof entity, EMB, to her father. Even without proof of intent to defraud, constructive fraud may be shown where the debtor transfers assets without fair consideration and the debtor therby becomes insolvent (see Debtor and Creditor Law § 273; American Panel Tec v Hyrise, Inc., 31 AD3d 586, 587, 819 NYS2d 768 [2d Dept. 2006]; Matter of EAC of NY, Inc. v Capri 400, Inc., 49 AD3d 1006, 1007 [3d Dept. 2008]).
Likewise, in Trustees of the NY City Dist. Council of Carpenters Pension Fund v Centurion Cos., Inc., supra, the Court found that allegations that two entities are owned, managed, and controlled by the same family, operate out of the same premises, and have the same operations, equipment, customers, and business purpose (the installation of flooring) sufficed to establish that one was the alter ego of the other. With respect to the wrongdoing requirement, the plaintiffs therein alleged that one entity ceased operations and that its assets and operations were transferred to the other entity (similarly to the case at bar) to render the first entity judgment proof, thereby enabling it to escape its liabilities to plaintiffs. 
New York courts recognize and apply the doctrine of equitable ownership to veil pierce even against non-owners/non-shareholders of companies (see Cornwall Mgt. Ltd v Kambolin, 2015 NY Misc LEXIS 1546, *16 [Sup. Ct. NY Co. 2015]), when there is equitable cause to do so. The key is the necessity to provide justice in unjust circumstances.
AMC proved at trial that the Batalias family, specifically Michael and Elisavet, exercised complete dominion and control over both corporate entities in this case, using them interchangeably whenever it suited their needs to do so. On or around 1998, Michael Batalias placed the entity in Elisavet Batalias's name, when she was twenty-two (22) years old and still in college, and had no experience in construction. Nonetheless, Michael Batalias actually controlled the company. In 2010, after EMB was barred following criminal charges, Ms. Batalias transferred EMB to her father without consideration, which, as aforesaid, is suspect. The documentary evidence at trial indicated that Ms. Batalias still continued to work there, until 2015, and approved certain invoices on EMB's behalf. She testified that she worked at EMB because she owned part of Chilled, and was interested in the project, since EMB was the general contractor. Ms. Batalias testified that Chilled really does not do much work, because the hotel is run by a management company also owned by her and her siblings. While Ms. Batalias owned EMB, that entity performed $4,500,000 worth of concrete work on two parcels of land in [*10]Long Island City, one of which was owned by Michael Batalias and his wife, one of which was owned by Ms. Batalias and her siblings, for no payment. Ms. Batalias stated that, because her family could not pay EMB for the work, they signed over the parcel of land directly to her as payment for the work EMB performed. It was not signed over to EMB. This constitutes improper usurpation of a corporate asset by a corporate officer. After she received the land to pay off EMB's debt, she created a new corporation, with her siblings, called Chilled Properties, to which Ms. Batalias, without consideration, transferred the property which she had purportedly taken personally as payment for EMB's work. By so doing, and leaving EMB inadequately capitalized to pay the plaintiff, she engaged in acts amounting to an abuse of the corporate form to perpetrate a wrong or injustice against the plaintiff (see Weinberg Olivieri Constr. Corp. v WN Weaver St., LLC, 144 AD3d 765, 767 [2d Dept. 2016]). These were obviously not arms-length transactions. Stella and Vicki, former EMB employees, now worked for the hotel's management group and Chilled, respectively, both owned by Ms. Batalias. Thus there is a commonality of management and control by the Batalias family. Ms. Batalias now owns ten percent (10%) of Chilled Properties Limited, which now owns the hotel where the work was performed. Her four siblings own the remaining shares. Mr. Batalias owns EMB, a company that is apparently judgment-proof. This is a convenient arrangement, since it means that the plaintiff, the party in privity with the general contractor EMB, will be unable to collect the money for the additional work it performed cutting the balconies, while the related company, Chilled Properties, retains the benefit of the plaintiff's work. The Court finds that the Batalias family engaged in a scheme to hamper the ability of creditors such as the plaintiff to collect payments due them for their work.
The Batalias family used such control over both entities to commit a wrong causing injury to plaintiff. This is a sufficient showing to pierce the corporate veil under the alter ego theory and sustain contract claims against both defendant EMB and Chilled Properties, Inc. (see Trustees of the NY City Dist. Council of Carpenters Pension Fund v Centurion Cos., Inc., 2016 NY Misc LEXIS 2507, *9 [Sup. Ct. NY Co. 2016]; AZTE, Inc. v Auto Collection, Inc., 124 AD3d 811 [2d Dept. 2015]; Flushing Plaza Assoc. No.2 v Albert, 102 AD3d 737 [2d Dept. 2013]).
CONCLUSION
By reason of the foregoing, the Court renders its decision in favor of plaintiff Americore Drilling & Cutting, Inc., in the sum of one hundred eighteen thousand dollars ($118,000), the amount of services performed, with interest from December 3, 2012 (the date that all work was completed). Both corporate defendants are liable for this amount jointly and severally.
The evidence adduced at the trial showed that the defendants intended to erect a hotel on Batalias family-owned properties. They utilized the cutting services of the plaintiff to make interior and exterior cuts in concrete required for the project. After the [*11]work was completed, the defendants, without good faith or just cause, refused to pay the plaintiff what was owed for the last phase of the work, that of shortening the balconies by cutting them. They made it impossible for the plaintiff to get paid by juggling the corporate entities, essentially engaging in a "shell game" so that the one that was in privity with the plaintiff was a shell corporation, without any capital to pay the plaintiff what it was owed.
Accordingly, based upon the foregoing, it is,
ORDERED, that the plaintiff is entitled to recover on its cause of action for breach of fiduciary duty against defendants EMB CONTRACTING CORP. and CHILLED PROPERTIES, LLC, jointly and/or severally, in the total sum of one hundred eighteen thousand dollars ($118,000), plus interest from December 3, 2012.
This constitutes the decision and order of the Court.
Dated: April 3, 2017
Timothy J. Dufficy, J.S.C.